## STATE OF FLORIDA *v.* ANDERSON ET AL.

Certain railroad companies, availing themselves of the provisions of an act of the legislature of Florida of Jan. 10, 1855, to provide for and encourage a liberal system of internal improvements in that State, issued their bonds to the extent of $10,000 per mile, the interest whereon was duly guaranteed by the trustees of the internal-improvement fund created by the act. Such bonds thereby became a first lien or mortgage on the roads, their equipments, and the franchises, of the respective companies. The latter having failed to pay the interest on the bonds, or the instalments due the sinking fund for their ultimate redemption, the roads were seized by the trustees, pursuant to their authority under the act, and sold for an amount equal to the principal of the bonds. The purchasers being allowed the privilege of paying the purchase-money by delivering the bonds at their par value, nearly a million dollars of them were

thus surrendered and cancelled; but a balance of about $472,000 remained unpaid. The purchasers obtained, however, a deed for, and took possession of, the property, being a line of road from Lake City to Quincy, with a branch from Tallahassee to St. Mark's, and procured a new charter from the legislature, under the name of "The Tallahassee Railroad Company." Having subsequently consolidated their interests with the Florida Central Railroad Company, owning the road from Lake City eastward to Jacksonville, they procured another charter, with enlarged powers, creating a corporation by the name of "The Jacksonville, Pensacola, and Mobile Railroad Company." This last act of incorporation authorized the company to acquire and consolidate certain lines of road, and extend the same from Quincy westward to the western boundary of the State; and, with a view to aid the company in the completion of this work, the act, as subsequently amended by the legislature, authorized the governor to loan the company bonds of the State, to an amount equal to $16,000 per mile, in exchange for an equal amount of the first-mortgage bonds of the company. In order to secure the principal and interest of the company's bonds, it was declared "that the State of Florida shall, by this act, have a statutory lien, which shall be valid to all intents and purposes as a first mortgage duly registered on the part of the road for which said bonds were delivered, and on all the property of the company, real and personal, appertaining to that part of the line which it may now have, or may hereafter acquire, together with all the rights, franchises, and powers thereto belonging; and in case of failure by the company to pay either principal or interest of its bonds, or any part thereof, for twelve months after the same shall become due, it shall be lawful for the governor to enter upon and take possession of said property and franchises, and sell the same at public auction." Under this power, bonds of the State to the amount of $4,000,000 were delivered to the company. The balance of the purchase-money due on the trustees' sale remaining unpaid, and the Jacksonville, Pensacola, and Mobile Railroad Company having also failed to pay the interest on their bonds delivered to the State in exchange for those of the State aforesaid, the State and the trustees of the improvement fund commenced suit in a circuit court of the State to recover by a sale of the road the balance of such purchase-money, which was claimed to be a lien thereon. All then known parties having liens against the road were made defendants. Suit was also brought against the company, in another circuit, by certain first-mortgage bondholders. The Circuit Court of the United States for the Northern District of Florida also entertained, at the instance of certain other bondholders, a suit in equity against the company and the trustees; but the bill, as against the latter, was dismissed by the complainants. Under an arrangement between the complainants and the company, a consent decree was obtained, declaring the bonds a first lien on the road, and directing its sale to pay the same. Subsequently to the issue of the execution a bill was filed to carry the decree into execution, making the trustees of the internal-improvement fund defendants, and charging them with intent to seize the road, and praying for an injunction. Meanwhile suit was commenced in the same court against the company by one H. for services alleged to have been rendered it. Judgment was recovered accordingly for $60,000; and, at the sale of the road thereunder, he became the purchaser for $20,000, and entered into possession. Under these circumstances, the State of Florida filed the bill in this suit.

*Held, First,* That the State has a direct interest in the railroad by reason of holding the $4,000,000 of bonds, which were a statutory lien on the road. That, as the title to the lands composing the internal-improvement fund were vested in the trustees merely as the agents of the State for a particular purpose, her interest is sufficient to give her a standing in court whenever the interests of that fund are brought before a court for inquiry. It is competent for her, therefore, in seeking equitable relief against citizens of another State for the protection of her interests, to file an original bill in this court.

*Second,* That the equitable lien for the unpaid purchase-money accruing upon the sale by the trustees resulted primarily to them as vendors, and became binding on the road in the hands of all subsequent purchasers taking with notice of the non-payment.

*Third,* That, as the guaranteed bonds import on their face an absolute promise to pay, the company giving them is primarily liable to the holder thereof for principal and interest as they respectively become due; and while he can, upon a breach of such promise, bring suit against the company, he cannot, as the primary right to proceed under the statutory lien is in the trustees, avail himself of that lien directly, as he could if it were a mortgage given to secure the bonds alone, but must induce the trustees to act in the mode pointed out by the statute. Upon their refusal so to act at the proper time, he may either compel them by *mandamus,* or file a bill in equity to obtain the relief to which he may be entitled.

*Fourth,* Where a sale is made by the trustees for the non-payment of interest or instalments due the sinking fund, and the principal of the bonds is not due, they have an option, after satisfying the arrears of interest, either to purchase up and retire the bonds, or to pay the balance into the sinking fund, and postpone the payment of the principal until the bonds arrive at maturity. By the purchase of a portion of the bonds, an obligation to purchase the remainder is not imposed upon the trustees, nor are they precluded from changing a resolution so to purchase.

*Fifth,* Holders of bonds so guaranteed, by procuring with the consent of the company a decree for the sale of the road to pay the interest, and especially the principal thereof, when the bonds contain no stipulation that the principal shall become due by the non-payment of interest, in a proceeding in which neither the State nor the trustees were represented, and when the latter were pursuing their lawful remedy to subject the road to the payment of the purchase-money at a sale made by them, was an inequitable interference with, and a fraud upon, their rights.

THIS is an original suit in equity instituted in this court.

It was argued by *Mr. H. Bisbee, Jr.,* for the complainant; and by *Mr. Henry R. Jackson, Mr. Matt. H. Carpenter,* and *Mr. William W. Boyce,* for the defendants.

MR. JUSTICE BRADLEY delivered the opinion of the court.

This is a bill in equity filed by the State of Florida (by its attorney-general), on behalf of the said State and of the trustees of the internal-improvement fund of the State, against

Daniel P. Holland and Edward C. Anderson and others, citizens of Georgia. Sherman Conant, the Marshal of the United States for the Northern District of Florida, is made a formal defendant by reason of having in his hands an execution at the suit of some of the other defendants.

The subject-matter of the suit is a line of railroad in Florida extending from Jacksonville westwardly to Quincy about one hundred and ninety miles, with a branch from Tallahassee to St. Mark's of twenty-one miles. It consists of three divisions, originally built and owned by different companies. The first division, from Jacksonville to Lake City, was built and owned by the Florida, Atlantic, and Gulf Central Railroad Company; the second, from Lake City to Quincy, by the Pensacola and Georgia Railroad Company; and the branch, from Tallahassee to St. Mark's, by the Tallahassee Railroad Company. These companies were chartered in 1853; and after the passage by the State legislature, Jan. 6, 1855, of a certain act entitled "An Act to provide for and encourage a liberal system of internal improvements in this State," they severally availed themselves of its provisions, and issued bonds which were duly guaranteed by the trustees of the internal-improvement fund created by the act. This fund consisted of the five hundred thousand acres of public lands which became vested in the State under the grant made by Congress for the purposes of internal improvement by the act of Sept. 4, 1841 (5 Stat. 455), and of some fifteen millions of acres of swamp and overflowed lands granted by act of Congress of Sept. 28, 1850, to enable the State to construct the necessary levees and drains to reclaim the same. 9 Stat. 519. By the internal-improvement act of Jan. 6, 1855, above referred to, these lands and their proceeds were constituted a distinct and separate fund, to be called "The Internal Improvement Fund of the State of Florida," and were vested in the governor of the State, the comptroller, treasurer, attorney-general, and register of State lands, and their successors in office, in trust to dispose of the same, and invest the proceeds, with power to pledge the fund for the payment of the interest on the bonds (to the extent of $10,000 per mile) which might be issued by any railroad companies constructing roads on certain lines indicated by the act. The

companies, after completing their roads, were to pay, besides interest on their bonds, one per cent per annum on the amount thereof, to form a sinking fund for the ultimate payment of the principal. The act declared that the bonds should constitute a first lien or mortgage on the roads, their equipment and franchises; and, upon a failure on the part of any railroad company accepting the act to provide the interest and the payments to the sinking fund as required thereby, it was made the duty of the trustees to take possession of the railroad and all its property, and advertise the same for sale at public auction.

In the management of the fund the trustees were to fix the price of the lands, having due regard to their location, value for agricultural purposes, &c., and make such arrangement for drainage of the overflowed lands as in their judgment might be most advantageous to the fund and the settlement and cultivation of the land; and they were directed to encourage actual settlement and cultivation of the lands by allowing preemptions under such rules and regulations as they might deem advisable, but not more than one section of land to any one settler. Other duties of a public character in relation to the lands were devolved upon the trustees by subsequent enactments.

At the close of the war, the railroads were in a dilapidated condition; and, the companies having failed to pay the interest and the instalments due to the sinking fund on their bonds, the roads were seized and sold by the trustees under the provisions of the act. The first section, from Jacksonville to Lake City, was sold in 1868, and the purchasers procured an act of incorporation under the name of "The Florida Central Railroad Company." The other two sections were sold on the 20th of March, 1869, for an amount equal to the principal of the outstanding guaranteed bonds issued on them; and, the purchasers being allowed the privilege of paying the purchase-money by delivering the bonds at their par value, nearly $1,000,000 of them were thus surrendered and cancelled. But a balance of about $472,-000 remained unpaid. By some contrivance of the purchasers (which both the complainants and E. C. Anderson and his associates agree in characterizing as fraudulent), this balance was not paid at all, but was only formally settled by inducing the agents of the trustees to accept a check for the amount,

upon the receipt of which they delivered to the purchasers a deed for the property which had been executed for that purpose and placed in their hands, and the purchasers possessed themselves of the road. This check was never paid. Anderson and others, defendants, or represented in this cause, hold upwards of $300,000 of the still outstanding guaranteed bonds of the Pensacola and Georgia and Tallahassee Railroad Companies, which the purchasers failed to deliver up, besides $103,000 which are in dispute.

The purchasers of the Pensacola and Georgia and Tallahassee Railroads, and their associates or assigns, applied to the legislature of Florida for a new charter, which was granted to them with the name of " The Tallahassee Railroad Company ; " but after a few months, having procured another charter with enlarged powers, creating a corporation by the name of " The Jacksonville, Pensacola, and Mobile Railroad Company," they consolidated their interests with that company as early as May or June, 1870, and have ever since been known under that designation. It is conceded by Anderson and the other bondholders, and is clearly the result of the evidence in the case, that this company, whilst it succeeded to the rights of the purchasers at the trustees' sale, received the property subject to the vendor's lien for the payment of the balance of the purchase-money due on that sale. An adjudication to this effect has been made against the company in the suit in Duval County Circuit Court, hereinafter referred to.

The act which incorporated the Jacksonville, Pensacola, and Mobile Railroad Company authorized that company to consolidate and acquire all the roads before mentioned, and to extend the same from Quincy westward to the western boundary of the State in the direction of Mobile; and, with a view to aid the company in the completion of this work, the same act, as amended by an act passed Jan. 28, 1870, authorized the governor of the State to loan to it the bonds of the State to an amount equal to $16,000 per mile, in exchange for an equal amount of first-mortgage bonds of the company. In order to secure the principal and interest of the company's bonds, it was declared that " the State of Florida shall, by this act, have a statutory lien, which shall be valid to all intents and pur-

poses as a first mortgage, duly registered, on the part of the road for which said bonds were delivered, and on all the property of the company, real and personal, appertaining to that part of the line which it may now have or may hereafter acquire, together with all the rights, franchises, and powers thereto belonging; and, in case of failure of the company to pay either principal or interest of its bonds or any part thereof for twelve months after the same shall become due, it shall be lawful for the governor to enter upon and take possession of said property and franchises, and sell the same at public auction."

Under this power, State bonds to the amount of $4,000,000 were delivered to the company in exchange for $3,000,000 of the company's bonds and $1,000,000 of the bonds of the Florida Central Railroad Company, and have been in whole or in part disposed of.

The balance of purchase-money accruing on the trustees' sale still remaining unpaid, and the Jacksonville, Pensacola, and Mobile Railroad Company having also failed to pay the interest on their bonds, delivered in exchange for State bonds as aforesaid, a suit was instituted in March, 1872, by the State of Florida and the trustees of the internal-improvement fund against the company, in the Circuit Court of Duval County, at Jacksonville, to recover, by a sale of the railroad, the said balance of purchase-money, which was claimed to be a lien thereon. By an amended complaint, all known parties having liens against the railroad were made defendants. Anderson and the other first-mortgage bondholders, who are defendants in this suit, were not made parties, because their interest was not then deemed adverse to that of the State. Holland was not made a party, because at that time he claimed no interest in the property. On the commencement of this suit, the Duval County Circuit Court appointed Jonathan C. Greeley receiver to take possession of the railroad and secure its receipts and earnings. But immediately a crop of litigation sprang up, hostile to the rights asserted by the State and trustees. It was contended that the territorial jurisdiction of the court did not extend beyond the county limits, and that the authority of the receiver was limited thereby, and that the Florida Central Railroad Company was not consolidated with the Jacksonville, Pensacola,

and Mobile Railroad Company; and other positions antagonistic to the rights and proceedings of the State were assumed, and suits were commenced in various courts to carry out these views.   Amongst others, the Leon County Circuit Court (at Tallahassee) entertained a suit brought by some first-mortgage bondholders, and appointed a receiver, who took possession of the western part of the road.   The result was, that the receiver appointed by the Duval County Court was dispossessed of the entire line.

At this point, in July, 1872, the defendants, Anderson and his associates, commenced a suit in the Circuit Court of the United States for the Northern District of Florida against the Jacksonville, Pensacola, and Mobile Railroad Company, and the trustees of the internal-improvement fund, upon the first-mortgage bonds held by them, claiming that these bonds were still a lien on the railroad, or at least entitled the holders to claim the unpaid purchase-money before referred to, and praying a sale of the road to pay their demand.   The trustees pleaded to the jurisdiction of the court, alleging for cause, amongst other things, that it appeared by the bill and exhibits that the subject-matter of the bill was in the jurisdiction and possession of a circuit court of the State.   The bill was thereupon voluntarily dismissed as against the trustees; and, by an arrangement made with the railroad company (which withdrew its answer), the complainants obtained a consent decree on the 19th of December, 1872, declaring the bonds a first lien on the railroad, and directing it to be sold to pay the same.   An execution was issued on this decree and placed in the marshal's hands, and a sale of the property was advertised.   In September, 1873, Anderson and his associates filed in the same court another bill to carry into execution their said decree, making the trustees of the internal-improvement fund defendants, charging them with an intent to seize the railroad, and praying an injunction against their so doing.

Meantime the defendant, Holland, had commenced a suit in the said Circuit Court of the United States against the Jacksonville, Pensacola, and Mobile Railroad Company, to recover compensation for alleged services; and on the 2d of December, 1872, he recovered a judgment by default for over $60,000, and

issued execution thereon. Under this execution the marshal advertised and sold the whole railroad in May, 1873; and Holland became the purchaser for the price of $20,000, and entered into possession. By an arrangement made with Anderson and his associates, Holland kept possession until the appointment of a receiver by this court.

Under these circumstances the State of Florida filed the bill in this suit, setting forth the principal facts before rehearsed, and praying that the sale under Holland's judgment might be declared null and void, and that he might be enjoined from setting up any rights under it; that the decree obtained by Anderson and others might be set aside and declared null and void, and that they might be enjoined from setting up any rights under it. The bill having stated that the principal of the internal-improvement bonds held by the defendants was not yet due, and would not be due for many years to come, the complainant prayed the court further to decree that the defendants have no right to payment of their principal until their bonds mature; and that they are bound to resort to the internal-improvement fund as a primary fund for the payment of both principal and interest before resorting to the railroad. The bill concludes with a prayer for alternative and general relief.

It having become manifest to us in the course of the proceedings that the interest of all parties required that the fund in litigation should be under the control of this court, we appointed a receiver to take charge of the railroad, and operate the same.

A demurrer to the bill having been overruled, answers were filed by the defendants, and proofs taken; and the case is now before us on the pleadings and the evidence.

It is not our purpose to discuss minutely the questions of fact that have been raised by the parties. The most material questions are either conceded by all the parties, or are so free from doubt as to render such discussion unnecessary. Our conclusions thereon will become manifest as we proceed to give our general views upon the case.

The first question which naturally presents itself is, whether the State of Florida has such an interest in the subject-matter

of the suit, and in the controversy respecting the same, as to give it a standing in court. It is suggested that the trustees of the internal-improvement fund are the only parties legally interested, and that they have no right to bring an original bill in this court. To this it may be answered, in the first place, that the State has a direct interest in the subject-matter (the railroad in question) by reason of holding (as it does) the four millions of bonds which are a statutory lien upon the road. In the next place, the interest of the State in the internal-improvement fund is sufficiently direct to give it a standing in court, whenever the interests of that fund are brought before a court for inquiry.

From the statement already made in reference to the history and character of this fund, and the duties of the trustees in regard to it, it is apparent that the trustees are merely agents of the State, invested with the legal title of the lands for their more convenient administration; and that the State remains in every respect the beneficial proprietor, subject to the guaranties which have been made to the holders of railroad bonds secured thereby. The residuary interest in the fund belongs to the State. The fact that the trustees consist of the governor and other executive officers, and that they are charged with the duties of drainage, reclamation, and settlement of the public lands (duties of a purely public character), shows that they are mere public agents invested with an important branch of the State administration.

Now, to protect its interests, it is competent for the State, seeking equitable relief against citizens of another State, to file an original bill in this court. The reference to the trustees in the bill cannot affect the jurisdiction of the court, inasmuch as they are not the litigants before it. It has frequently been decided in the circuit courts, where the jurisdiction depended on the citizenship of the parties, that such jurisdiction is not ousted, where there has been occasion to make a formal party of a sheriff or other public officer by reason of his having a writ of execution, or being named as obligee in an official bond sued for the benefit of private parties, provided that the real parties to the litigation have the requisite citizenship. Thus an administration bond given to the surrogate or to the governor of

a State may be sued in his name in the Circuit Court of the United States, though not having the requisite citizenship, if the party for whose benefit the suit is prosecuted has the requisite citizenship. These authorities apply equally to the case of the marshal who was named in the bill, but against whom no relief was sought. Several of the cases are reviewed in the recent case of the *Coal Company* v. *Blatchford*, 11 Wall.. 172; and a further discussion of the subject at this time is unnecessary.

We come, then, to the principal question in the cause; which is, whether upon the pleadings and evidence in the case the complainant has ground for the relief sought, or for analogous relief, admissible under the general prayer of the bill.

The equitable lien for the unpaid purchase-money accruing upon the trustees' sale of the railroad in 1869 resulted primarily to the trustees as the vendors, and became binding on the road in the hands of all subsequent purchasers taking with notice of the non-payment. As before stated, the Jacksonville, Pensacola, and Mobile Railroad Company undoubtedly took the property subject to this lien; and it has been so decided in the Duval County suit. The defendant, Holland, stood in no better situation. He had full knowledge of the circumstances before obtaining his judgment, and purchased only the right, title, and interest of the company. His claim to hold the property clear of the lien, and to take the rents and profits, when the State is seeking to have the road and profits secured and applied to the satisfaction thereof, is inequitable and unjust. Independent of any claim of the State under the $4,000,000 of bonds issued in 1870, he has no right to oppose it in its efforts to secure satisfaction of the original purchase-money of the property. His judgment may be perfectly valid as against the railroad company, and he may have acquired under it all the right, title, and interest of said company; but nothing more. As against the claims of the State, he has no right to appropriate to himself the possession and emoluments of the property. His employment of judicial process for that purpose, even though the powers of the receiver should be successfully controverted, is inequitable so long as the rights of the State are sustained, or not disaffirmed by the proper courts.

As to the bonds given by the railroad company to the State in 1870 in exchange for its bonds, Holland does not directly question their validity, though he insists that the latter were issued in violation of the constitution of the State. The validity of these bonds is a delicate question, and one which it is eminently proper that the courts of Florida should determine. The judges of the Supreme Court of that State, in answer to certain questions propounded by the governor, in accordance with a provision of the State constitution, have given an official opinion which has been generally understood as favorable to the validity of the bonds. Until that court shall decide the contrary, we prefer to take that view; and, regarding the bonds of the company as valid and binding, the right of the State as against the pretensions of Holland to control the possession and emoluments of the property cannot be doubtful. Should the State courts hereafter determine against the validity of those bonds, further consideration of the subject can be had. Of course, if it were necessary to do so, this court would not hesitate to pass upon that question; but we do not deem it necessary in this suit, which, in its nature, is rather to be regarded as ancillary to the judicial proceedings adopted by the State in Florida.

The position of Anderson and his associates is different. They claim that their bonds are still a first lien on the railroad, notwithstanding the trustees' sale; and that at all events, though the principal of their bonds is not due, they are entitled to prosecute the lien for the unpaid purchase-money due on said sale in order to obtain satisfaction of their bonds. They claim that their right to do this is paramount to that of the State or the trustees, inasmuch as the amount to be recovered is applicable to the payment of the said bonds; and this is really the question at issue between these parties. Its solution requires that we should examine a little more carefully the precise nature of the guaranty given to the bonds, and chargeable upon the internal-improvement fund. The entire third section of the act of Jan. 6, 1855, on which the controversy principally depends, is as follows: —

" SECT. 3. *Be it further enacted*, That all bonds issued by any railroad company under the provisions of this act shall be recorded

in the comptroller's office, and so certified by the comptroller, and shall be countersigned by the State treasurer, and shall contain a certificate on the part of the trustees of the internal-improvement fund that said bonds are issued agreeably to the provisions of this act, and that the internal-improvement fund, for which they are trustees, is pledged to pay the interest as it may become due on said bonds. All bonds issued by any railroad company under the provisions of this act shall be a first lien or mortgage on the road-bed, iron, equipment, workshops, dépôts, and franchise; and upon a failure on the part of any railroad company accepting the provisions of this act to provide the interest as herein provided on the bonds issued by said company, and the sum of one per cent per annum as a sinking fund, as herein provided, it shall be the duty of the trustees, after the expiration of thirty days from said default or refusal, to take possession of said railroad and all its property of every kind, and advertise the same for sale at public auction to the highest bidder, either for cash or additional approved security, as they may think most advantageous for the interests of the internal-improvement fund and the bondholders. The proceeds arising from such sale shall be applied by said trustees to the purchase and cancelling of the outstanding bonds issued by said defaulting company, or incorporated with the sinking fund; *provided* that, in making such sale, it shall be conditioned that the purchasers shall be bound to continue the payment of one-half of one per cent semi-annually to the sinking fund until all the outstanding bonds are discharged, under a penalty of the annulment of the contract of purchase and the forfeiture of the purchase-money paid in."

Of course, the company giving the bonds is primarily liable to the bondholders for principal and interest as they become due, inasmuch as the bonds import on their face an absolute promise to pay; and, on failure to pay, suit may be instituted at once against the company. Back of this personal liability of the company, the bondholder has a double security: first, the guaranty of the internal-improvement fund; and, secondly, the statutory lien on the railroad. He cannot avail himself of the latter directly, as he could if it were a mortgage given to secure the bonds alone; but he must induce the trustees to act in the mode pointed out by the statute. If they refuse to act when they ought to do so, the bondholder may either compel them to act by *mandamus*, or file a bill in equity to obtain the relief to which he may be entitled.

It is seen, however, that the primary right to proceed against the property is in the trustees, and not in the bondholders. But if principal or interest become due and be unpaid, and the trustees have not the means to pay it from any available resources of the internal-improvement fund in one case, or the sinking fund in the other, it will be their absolute duty to proceed against the property.

In the present case, the trustees did initiate proceedings, and did sell the property by virtue of the lien created by the statute; and through that sale they succeeded in extinguishing a large amount of the outstanding bonds. But the purchasers failed to pay the entire purchase-money, and a vendor's lien attached. The original lien of the bonds was consummated and merged in the title which the purchasers acquired by the sale. Anderson and company cannot set it up anew without repudiating the sale, and bringing back upon the property, in coexistence with their own claim, the lien of the $1,000,000 of bonds which have been cancelled. This, it is presumed, they are not prepared to do. Indeed, they nowhere attempt to repudiate the sale. They claim, that, notwithstanding the sale, the lien of their bonds still subsists. But this cannot be. The sale was made by virtue of the joint statutory lien of all the bonds, and vested in the purchasers a title clear of them all, subject only to the vendor's lien for the purchase-money. As already seen, by the internal-improvement act, only the interest of the bonds is guaranteed upon the credit of the internal-improvement fund: the principal is provided for by the creation of the sinking fund, which is a charge on the road in the hands of all purchasers until the bonds are satisfied. When a sale is made by the trustees for non-payment of interest or sinking fund, and the principal of the bonds is not due, they have an option (of course, after satisfying the arrears of interest) either to purchase up and retire the bonds, or to pay the balance into the sinking fund, and postpone the payment of the principal until the bonds arrive at maturity. Which of these two things they shall do is entirely in their discretion; and a purchase by them of a portion of the bonds does not impose upon them the obligation to purchase the balance. Nor does a resolution to purchase bonds, formed at one

time, preclude them from changing that resolution at a subsequent time.  The contrary position assumed by the defendants we consider as untenable, and repugnant to the spirit of the act.

In the present case, as we have seen, the principal of the bonds is not due; and, if the trustees should collect the balance of purchase-money to-day, it would be in their option to purchase the bonds or not.  There is no stipulation in the bonds that the principal shall become due by the non-payment of the interest.  The getting of a consent decree by the bondholders for the sale of the road to pay their bonds, and especially the principal thereof, in a proceeding in which neither the State nor the trustees were represented, and when the latter were pursuing their lawful remedy to subject the road to the payment of the purchase-money (as was their duty to do), was an inequitable interference with, and a fraud upon, their rights.

We are of opinion, therefore, that the defendants ought to be enjoined from selling, taking possession of, or interfering with the railroad property in question (that is to say, the line of railroad extending from Lake City to the Chattahoochee River, and from Tallahassee to St. Mark's), so as in any manner to impede, obstruct, or hinder the State of Florida, or the trustees of the internal-improvement fund, in taking possession of the property, or in procuring it to be condemned and sold for the purpose of raising and paying the unpaid purchase-money, and such amount as may be adjudged or decreed by the proper courts or tribunals in that behalf to be due to the State upon the bonds delivered to its officers by the Jacksonville, Pensacola, and Mobile Railroad Company, under the act of Jan. 28, 1870.

A decree will be made accordingly.

It will also be proper to continue the receiver appointed by this court until the property can be delivered up to some proper and competent officer or persons having the requisite authority to receive the same.

The decree should contain a proviso that it is not intended to preclude the right of Anderson and the other first-mortgage bondholders to demand and receive from the State or the trustees, out of the proceeds of said property, or of said internal-

improvement or sinking funds, respectively, any amount of principal or interest which may be or may become due on their bonds; nor to affect the validity of their decree in the Circuit Court, except as above stated.

### DECREE.

This cause coming on for hearing upon the pleadings and proofs, and being argued by *Mr. Bisbee* for the complainant, and by *Messrs. Jackson, Carpenter,* and *Boyce* for the defendants, and the court having considered of the same, it is now, on this thirteenth day of December, 1875, ordered, adjudged, and decreed, that the defendants, and each of them, be perpetually enjoined from hindering, or interfering with, or disturbing the State of Florida, or any of its officers or agents (including the trustees of the internal-improvement fund of said State), or any officer or receiver appointed or acting in its behalf, in the possession, management, or control of the railroad of the Jacksonville, Pensacola, and Mobile Railroad Company, extending from Lake City westwardly to or beyond the Chattahoochee River, and from Tallahassee to St. Mark's, with the appurtenances thereof and property belonging thereto; and that Edward C. Anderson, Jr., and others, defendants herein, holders of first-mortgage bonds of the Pensacola and Georgia and Tallahassee Railroad Companies, in whose favor a decree was rendered in the Circuit Court of the United States for the Northern District of Florida on the nineteenth day of December, 1872, directing amongst other things a sale of said railroad, be perpetually enjoined from selling, or procuring to be sold, said railroad and property under or by virtue of said decree, or any decree supplementary thereto in the same case: *provided,* however, that nothing herein is intended to preclude the right of the said Anderson and others to demand and receive from the State of Florida or the said trustees, out of the proceeds of said property, or of said internal-improvement fund, or the sinking fund provided in that behalf, respectively, the principal and interest which may be or may become due on their said bonds; nor to affect the validity of the said decree, except as above expressed: and provided, further, that this decree is not intended to prejudice the right of the defendant, Daniel

P. Holland, to contest in any competent court or proceeding the validity of the bonds issued by the Jacksonville, Pensacola, and Mobile Railroad Company in exchange for the bonds of the State of Florida under the act of the legislature of said State passed Jan. 28, 1870, recited in the pleadings in this cause; nor to prejudice any right which said Holland may have to redeem said railroad by the payment of the unpaid purchase-money mentioned in the said pleadings, with all interest thereon and lawful charges on said road, in case it should be adjudged that the said bonds are invalid.

It is further ordered and decreed, that the legal costs and charges of the State of Florida in this cause, and the fees and costs due to the officers of this court therein, be allowed and paid out of the moneys in the hands of the receiver.

It is further ordered, that the receiver do pay out of the moneys in his hands the lawful fees and charges of the master who took the depositions and proofs in the cause; and that he settle his accounts before the clerk of this court, subject to the direction and approval of the Chief Justice.

And all further equities and directions arising upon the decree are hereby reserved.

At a subsequent day of the term, *Mr. Edward N. Dickerson* submitted a motion, due notice having been given thereof, that so much of the railroad and property thereto belonging as lies between Quincy and the Chattahoochee may be surrendered to James G. Gibbs, and that the receiver be discharged from that portion of the railroad, and be ordered to pay said Gibbs for the use thereof during such time as the same has been in the possession of the receiver.

At the same time, Anderson and others filed a petition for further direction under the decree. The Jacksonville, Pensacola, and Mobile Railroad Company filed a petition for the possession of the road as against the State; and the complainant moved to discharge the receiver, and surrender the entire property to such agent as should be appointed by the State of Florida. A petition was also filed for the payment of legal costs, charges, &c.

The matters arising upon the motions and petitions were argued by *Mr. E. N. Dickerson, Mr. H. Bisbee, Jr., Mr. Matt.*

*H. Carpenter, Mr. W. W. Boyce, Mr. W. G. M. Davis, Mr. D. P. Holland,* and *Mr. William Birney,* on behalf of the respective parties in interest.

MR. JUSTICE BRADLEY delivered the opinion of the court.

By the decree made in this case, we granted an injunction against the defendants to restrain them from hindering, interfering with, or disturbing the State of Florida in the possession, management, or control of the Jacksonville, Pensacola, and Mobile Railroad, extending from Lake City westwardly to or beyond the Chattahoochee River, and from Tallahassee to St. Mark's; saving to Edward C. Anderson, Jr., and others, holders of the first-mortgage bonds, their right to demand and receive from the State of Florida, or the trustees of the internal-improvement fund of said State, the amount due or to become due on their bonds; and saving to the defendant, Daniel P. Holland, the right to contest the bonds given by said company in exchange for bonds of the State of Florida to the amount of three millions of dollars, and any right of redemption which the said Holland might have in said property. The rights claimed by Holland have since been fully contested by him in the State courts, and their decision is adverse thereto. The Supreme Court of Florida has adjudged that the sale of the railroad under Holland's execution was null and void as against the State, and gave him no right to the possession or income thereof. This decision relieves this court from any embarrassment as to the disposition of the property. The State is the only proper party to receive it.

This suit was brought against Anderson and company and Holland, to prevent them from intermeddling with the property whilst being pursued by the State in due course of litigation in the State courts. It was in part ancillary to the relief sought there. When brought, neither of the defendants was a party to that litigation, all being citizens of Georgia, and not personally amenable to the courts of Florida, except by their own consent, or by being accidentally found there. Since then, however, Holland has voluntarily made himself a party to the suit in the State court, and has procured the decision referred to. By that decision, it is determined that the bonds given by

the railroad company to the State in exchange for State bonds in 1870 are valid to the extent of being security to the purchasers of the State bonds for the amount justly due to them, and create a statutory lien on the railroad prior to the judgment obtained by Holland or any other party, and entitle the State to seize and sell the same; and Holland has, therefore, been perpetually enjoined by the State court from interfering with the State in the possession of the road and its appurtenances. The majority of the Supreme Court went even farther, and held, that, by the laws of Florida, the railroad could not be levied on and sold under an execution at all.

Under these circumstances, and in view of the decree already made by this court, it would be improper to direct the delivery of the property to Holland. As this court has not cognizance of the principal litigation in the case, and cannot make any final disposition of the property, — being only called upon to decide on the conflicting rights of the State and the respective defendants to the immediate possession of it, — the only thing left for the court to do (having exercised all the jurisdiction it was called upon to exercise) is to order the receiver to deliver the property to the State, and to dispose of any moneys in the hands of the receiver.

Holland strenuously insists that the property ought to be restored to him, because he was in possession of it at the commencement of the suit. But he went into possession after the commencement of the suit in the State court, and we have expressly decided that his possession was inequitable; and, before the appointment of a receiver by this court, he had been deprived of that possession by the action of the State court. The receiver appointed by that court had taken the property out of his hands. It is true, we had required Holland to account to us for the income, and regarded the seizure of the property as interfering with that jurisdiction which the State itself, the complainant here, and also the complainant and moving party in the State court, had requested us to assume. We therefore felt justified in appointing a receiver to take full possession of the property; and the State court has since been held to have had no jurisdiction over the subject-matter. But there is nothing in these circumstances that gives Holland any right to

reclaim that possession when it may be resigned by our receiver. Holland's claim has been overruled by both the judgment of this court and of the State courts; and it would be worse than a vain and idle ceremony to deliver the property to him after these adjudications. It would be plunging the whole property into a new sea of litigation.

The claim of Gibbs to the possession of the road west of Quincy has more plausibility. It seems, that, at the commencement of this suit, Holland had possession of that part as a tenant of Gibbs. But the road is certainly a part of the entire line, and the title of Gibbs is disputed by the State, who claims that the statutory lien of the bonds issued in 1870 is paramount to all others; and neither Gibbs, nor any person holding under him, was in possession when the receiver was appointed by this court. Our receiver, in taking possession, did not take it from his hands, but from the hands of the receiver appointed by the State court, in the manner before adverted to. We think that no injustice will be done, but that the interest of all parties will be subserved, by delivering the road entire to the agent appointed by the State to receive the property, subject to the right on the part of Gibbs to institute legal proceedings against said agent for testing the question as to his right of possession. That part of the road, therefore, will be delivered to said agent subject to this right, so that Gibbs may not be embarrassed by being placed in the position of having to bring suit against the State. The question of his right is a question of law which can be submitted to the courts of Florida without much delay or expense.

The counsel of Gibbs object that he is not a party to this suit, and his rights ought not to be compromitted by the judgment or action of the court; and they insist that he ought to be placed *in statu quo ante bellum.* We do not decide upon his rights; we leave them just as they were: and as to the possession, we place it in the hands of the party at whose instance the receiver was appointed who had possession when it was assumed by this court.

As to the railroad between Lake City and Jacksonville belonging to the Florida Central Railroad Company, and which is still in the possession of our receiver for the purpose of ob-

taining payment of advances made by him in making necessary improvements on the road, as the amount due for those advances has been much reduced, we see no reason for further withholding the possession from the Florida Central Railroad Company. That road, therefore, will be directed to be delivered to said company, but subject to a claim on the part of the State to any balance which may be still due for the advances made by the said receiver, after all proper allowances to said company upon a due adjustment of the accounts between it and the receiver.

The court has taken into consideration various other matters necessary to be adjusted; and the result to which it has come will be expressed in the decree now made, which will not require further explanation. The balance of moneys that may remain in the hands of the receiver, after all proper payments and allowances, will be directed to be paid into the registry of this court for future disposition upon the final settlement and confirmation of the receiver's accounts.

The claim of Anderson and others remains, as regards the possession and sale of the road, exactly as when the former decree was made. The fact that some of their bonds have matured does not change their position in that respect.

The application of the Jacksonville, Pensacola, and Mobile Railroad Company for the possession of the road as against the State is not entitled to any consideration whatever. When the company shall have paid the balance of purchase-money due for the road, and the interest on its bonds, it will be time enough for it to put forth its pretensions.

The following order will be entered:—

And now, on this first day of May, A. D. 1876, the court being advised of certain proceedings and decrees had and made by and before the Circuit Court for Duval County, in the State of Florida, and by and before the Supreme Court of said State in the cause mentioned in the bill and pleadings in this case, wherein the State of Florida and the trustees of the internal-improvement fund of said State were plaintiffs, and the Jacksonville, Pensacola, and Mobile Railroad Company, and others, were defendants, whereby it hath been held and adjudged that the three thousand bonds for $1,000 each, issued by the said

company in the year eighteen hundred and seventy, in exchange for State bonds, are valid and binding, and create a statutory lien upon the railroad and property of said company, and that by virtue thereof the said State is entitled to take possession of said property and sell the same, not only to raise and pay the unpaid purchase-money mentioned in the said original bill, but also what may be justly due on said bonds; and that the sale of said railroad and property under execution at the suit of the defendant, Daniel P. Holland, was void and of no effect, and gave him no right or title, as against the said State, to the possession of said railroad and property, or to the income, tolls, or revenues thereof; and it appearing that the possession of that part of said railroad between Quincy and the Appalachicola River is claimed by one James G. Gibbs, but is a part of the said Jacksonville, Pensacola, and Mobile Railroad, and was not in possession of said Gibbs when the receiver was appointed by this court, nor of any person claiming under said Gibbs, and that his right to the possession thereof is denied by the said State as the holder of said bonds; and the said State of Florida, through its executive and the said trustees of the internal-improvement fund, having deputed Dennis Eagan, the commissioner of lands and immigration of said State, to receive the said railroad and property from the receiver of this court:—

Therefore it is ordered and decreed, that Robert Walker, the receiver appointed by this court, do, on or before the first day of June next, deliver the said railroad and all its appurtenances, extending from Lake City to the Appalachicola River, and from Tallahassee to St. Mark's, and all the rolling-stock and property connected therewith, to the said Dennis Eagan, commissioner of lands and immigration of the State of Florida on behalf of said State; reserving, however, to said James G. Gibbs, the right to institute against said Eagan and his successors having possession of said road any legal proceedings for the determination of his claim to the possession of the railroad between Quincy and the Appalachicola River, and the delivery to said Eagan of that portion of said railroad is subject to said right of the said Gibbs to institute such proceedings. And as to the railroad and property of the Florida

Central Railroad Company, which the said receiver still holds in his possession for the purpose of recovering the balance due for moneys expended by him in the improvement thereof, it is ordered that the same be delivered to the said Florida Central Railroad Company, subject to the payment of said balance that may be now due after all proper allowances to the State of Florida.

It is further ordered, that the said receiver do close and settle up the business of his receivership with all convenient speed; that he collect all moneys due for freights, passage, mail-service, and other services, and all dues of every kind which shall have accrued up to the time of his delivery of the possession as aforesaid, under his administration of said road and property; and that he settle his accounts for all receipts and expenses as receiver before the clerk of this court, who is hereby authorized to audit and settle the same under the direction of the Chief Justice; and that he exhibit his vouchers therefor. It is further ordered, that he have the use of all vouchers, reports, and statements connected with the operations or business of the said railroad during his administration which he may require in the settlement of his accounts, and that he be authorized to retain permanent possession of all books, papers, and accounts connected with his administration of the property during his receivership; giving access thereto, for the purpose of necessary information, to the officers of the State having the management of the said railroad.

It is further ordered and decreed, that out of the moneys in the hands of the receiver, or that may come to his hands, arising from the income, tolls, and revenues of said railroad, or other sources connected therewith, over and above the charges and expenses paid, he pay the following charges, demands, and amounts, in the order in which the same are here named; that is to say:—

*First,* The costs and expenses of this suit, including the fees and costs of the officers of this court, and of any master or examiner appointed by the court to take accounts or testimony in the case, and the taxable costs and charges of the complainant.

*Secondly,* All expenses and debts due or incurred by the receiver, and all proper claims arising against him, in the

administration of his trust as receiver, and not before paid or discharged, including stationery, clerk-hire, and travelling and other incidental expenses.

*Thirdly,* A sum of money to be retained by the receiver for his compensation as such, at the rate of $10,000 per annum, from the time of his assuming the duties of his appointment to the time of closing up the business incident thereto, including a reasonable time for the settlement of his accounts not later than the first day of July next.

*Fourthly,* To the Rogers Locomotive and Machine Works the sum of $15,800.84, and interest on the sum of $10,707.81, at the rate of seven per cent per annum, from the twenty-fourth day of August, 1874, till paid; being the amount due to said company for locomotives received and used by said receiver, on which said company had a specific lien.

*Fifthly,* All unpaid sums due to laborers and servants actually employed in the operation and care of said railroad west of Lake City, during the pendency of this suit, and prior to the time when the said receiver took charge of said property (namely, from the 9th of December, 1873, to the sixth day of May, 1874); which sums, according to the report of said receiver, amount to $12,000, or thereabouts.

*Sixthly,* Any balance of moneys that may remain in the hands of said receiver after the payment of the said charges, demands, and amounts, above specified, shall be paid by the receiver to the clerk of this court, who is hereby appointed register of the court to receive and keep the same subject to the further order of the court.