### BOUND v. SOUTH CAROLINA R. CO. et al.[1]

### ROSBOROUGH v. SMITH et al.

#### (Circuit Court of Appeals, Fourth Circuit. February 2, 1897.)

#### No. 187.

**1. RAILROAD FORECLOSURES—REORGANIZATION AGREEMENT—PURCHASE BY COMMITTEE —NONASSENTING BONDHOLDERS.**

B., a holder of second mortgage bonds of the S. Ry. Co., brought suit for the foreclosure of the mortgage. The trustees of the first mortgage filed a cross bill, asking foreclosure of their mortgage. A committee of first mortgage bondholders intervened, objecting to foreclosure of that mortgage, and persistently resisted it; but the court ultimately decreed a sale of the road free from all liens, including that of the first mortgage. The committee of first mortgage bondholders then advertised widely for bondholders to deposit their bonds under a reorganization agreement, and co-operate with them in buying in the road at the foreclosure sale, in order to protect their investment. A large majority of the first mortgage bonds were deposited. The committee bought the road at the upset price fixed in the decree and proceeded to organize a new company. The opportunity for bondholders to deposit their bonds and take the benefit of the reorganization was continued until the actual transfer of the road to a new company, and the issue of new securities and such opportunity was widely advertised. Some 16 months after the resale of the road to the new company, a first mortgage bondholder, who had not deposited his bond, intervened in the foreclosure suit, alleging that he had never seen the advertisements and that the bondholders represented by the committee had made a large profit in the transaction, and claiming a right to have his bond paid in full out of the proceeds of the sale of the road. *Held,* that the committee were not trustees for the bondholders who did not deposit their bonds under

[1] Rehearing denied February 12, 1897.
78 F.—4

the agreement; that the course pursued by them had been fair and proper; and that the committee having, before the intervener filed his petition, settled the accounts, distributed the proceeds of the resale, and been discharged from their trust, the intervener had no claim, as against them, for the payment of his bond. 71 Fed. 53, affirmed.

**2. SAME—REFUNDING BONDS.**

When mortgage bonds of a railroad company have been issued for the purpose, in part, of taking up bonds of a prior issue, and a large proportion of such prior bonds have been exchanged for the new issue, the fact that, upon a subsequent sale of the road under foreclosure the remaining prior lien bonds are paid in full, while the bonds of the new issue are not paid in full, does not entitle a holder of bonds of the new issue, received in exchange for prior lien bonds, to set aside the exchange, and be restored to his former position.

Appeal from the Circuit Court of the United States for the District of South Carolina.

The petition of the appellant, Rosborough, was filed September 4, 1895, in the case of Bound v. South Carolina R. Co., alleging that he was the owner of a $1,000 bond of said railroad company, with nine unpaid semiannual interest coupons, secured by the first consolidated mortgage of 1881; that by a decree of the said circuit court the said mortgage had been foreclosed by a sale of the railroad on April 12, 1894; that at said sale Henry W. Smith, Gustave E. Kissel, and Peter Geddes became the purchasers at the price of $1,000,000, being the minimum price limited by the decree; that there had been an agreement between the holders of a large majority of the said first consolidated mortgage bonds with reference to bidding at the sale and buying in the railroad, and that the said Smith, Kissel, and Geddes were a committee to carry into effect said agreement, but that the petitioner had never heard of the said agreement until within a few days before filing his petition; that the said agreement between the first consolidated mortgage bondholders had the effect of chilling the bidding at the sale, so that the purchasers obtained for their bid of $1,000,000 a property worth $8,000,000; that the petitioner, if obliged to take his pro rata of the fund produced by said sale, would only receive about 10 per cent. of the amount of his said bond and coupons. The petitioner further alleged that his said bond had been received by him in exchange for bonds which he had held secured by a mortgage prior to the said first consolidated mortgage, known as the "Mortgage of 1868"; that one of the objects of the said first consolidated mortgage of 1881 was to take up and retire the bonds secured by the said mortgage of 1868, and the majority of them had been so retired; but that there remained some outstanding, which the holders had never surrendered, and which were by the said decree of sale declared to be a lien paramount and superior to the said first consolidated mortgage. The petitioner then asserts that, as against the purchasers of said railroad, being a large majority of the holders of the first consolidated mortgage bonds represented by their said committee, he is now entitled to surrender his first consolidated mortgage bond, and fall back upon the lien which he had to secure his original bonds under the mortgage of 1868; and he prayed that the special master be directed to pay his claim in priority to the parties to the said bondholders' agreement, or, failing in this, that the railroad might be resold, and equity be done in the premises.

Notice to show cause why the relief prayed should not be granted was served on the special master and upon the said Smith, Kissel, and Geddes.

The special master answered that he had sold the mortgaged property and franchises on April 12, 1894, for $1,000,000, to the said Smith, Kissel, and Geddes, and had received in cash the sum of $400,000 on account of the purchase money, of which there remained in his hands unexpended $68,351.50, and also there remained the unpaid $600,000 of the purchase money, making $668,351.50, to be thereafter distributed as the court should direct.

Messrs. Smith, Kissel, and Geddes answered, stating: That on January 6, 1894, an agreement was made between certain holders of the first consolidated mortgage bonds of the South Carolina Railroad Company by which they were appointed a committee to act for all bondholders subscribing said agreement and depositing their bonds with the New York Guaranty & Indemnity Company, with power to act as the committee should consider proper in order to secure payment of the principal and interest of said bonds, and to purchase the mortgaged

property at such price as the committee might think expedient, not to exceed a sum sufficient to pay the said bonds, principal and interest, and all amounts having priority over said bonds. That the agreement provided "that said committee is not under any obligation, express or implied, to any bondholder who shall not subscribe this agreement and deposit his bonds, nor shall any bondholder not so signing and depositing his bonds have any rights or claims whatsoever under or by virtue of this agreement; but all the benefits and advantages of the same shall be confined to the persons who are subscribers thereto and who shall deposit their bonds with such guaranty and indemnity company. The time within which holders of said bonds may sign this agreement shall terminate at such time as said committee may decide; but said committee may extend such time in its discretion, and may permit any holder of said bonds, although such time has expired, to sign this agreement on the deposit of his bonds and may in that event impose such terms on any such holder of said bonds as said committee may determine." The answer states that said committee published a notice addressed to the holders of the first consolidated 6 per cent. mortgage bonds of the South Carolina Railroad Company from January 6, 1894, to March 3, 1894, in four of the most widely circulated New York City daily newspapers and in the Charleston Daily News and Courier on February 8, 9, 10, 12, and 13, 1894, and also in all the financial weekly newspapers published in New York City, to the number of 17. The notice stated that the United States circuit court for the district of South Carolina had, on November 20, 1893, decreed that the South Carolina Railroad should be sold at auction in Charleston on April 12, 1894; that the minimum bid fixed by the decree was $1,000,000; that it was to the interest of the junior securities to purchase the property at the lowest figure, and that it was to the interest of the bondholders to whom the notice was addressed to purchase the property rather than let it be sold at less than the amount of their bonds and interest, prior liens, and charges; that the prior mortgage amounted to about $244,000, with interest from November 23, 1892; that the committee, the said Smith, Kissel, and Geddes, whose names were signed to the notice, had for four years been acting in the interest of such of the first consolidated mortgage bondholders as they represented, and considered the property worth the amount of the first consolidated mortgage, with interest, and all prior charges; that it was essential that preparation should be made to prevent the road being purchased in the interest of junior securities at a price which would not pay the first consolidated bondholders in full; that bondholders wishing to participate in this arrangement must deposit their bonds on or before February 15, 1894, with the New York Guaranty & Indemnity Company, against negotiable receipts; that the committee were acting solely for such bondholders as should deposit their bonds under the agreement; and that all benefits and advantages would be confined to the persons who should so deposit their bonds and sign the agreement. They further answered that on March 3, 1894, they published another notice to the bondholders in the above-mentioned New York daily newspapers, and in the said 17 weekly newspapers, and continued the publication until March 10, 1894, giving notice that the holders of $4,252,000 out of a total issue of $4,883,000 of said first consolidated 6 per cent. bonds had signed the agreement, and that the time for depositing outstanding bonds was extended to March 10, 1894. That afterwards the committee continued to receive deposits of bonds until the day of sale, —April 12, 1894,—and that even after the sale no bonds were refused until a resale of the property was made. That the committee purchased the property for $1,000,000, and on May 12, 1894, resold the same to the South Carolina & Georgia Railroad Company, which simultaneously mortgaged the same to secure $5,250,000 of bonds, all of which, the committee state, they are informed have been negotiated. The committee, in their answer, further state that proceeds of the resale had been, long before the filing of the petition of Rosborough, distributed among the holders of the bonds who accepted the terms of the agreement, and the committee had been discharged from their trust, and no longer had any interest in the matter.

The petitioner, Rosborough, replied to the answer of the committee, alleging that the committee represented a syndicate which had bought up the first consolidated mortgage bonds at reduced prices with intention to manage the sale for their own benefit, and with that view had procured the court to decree a sale free from all incumbrances, and that no bid should be received less than $1,000,000, and had resold the road at a large profit to themselves, and that, as holders of said first mortgage bonds, they claim to participate in the distribution of the

fund now in court, notwithstanding their said profit, and the petitioner claimed that they ought not to be allowed to so participate until petitioner's bond was paid, or was put on an equality with those who signed the agreement.

So much of the original petition as prayed a resale of the railroad was by leave of the court stricken out. A reference was made to a special master to take testimony. The only witnesses examined were two persons produced by the petitioner, who had held first consolidated mortgage bonds and who testified that they had received a circular from the committee, and had settled on the terms stated in it. The circular produced in evidence was signed by the committee, and was addressed to the persons who had deposited their bonds with the New York Guaranty & Indemnity Company. It notified them that the sale and transfer of the property to the South Carolina & Georgia Company had been completed, and that they would receive new first mortgage bonds of that company (total issue, $5,250,000) bearing interest at 5 per cent. from May 1, 1894, to an amount which, at the price of 94, would equal the principal of their deposited bonds, and would also receive 10 per cent. of the principal of the deposited bonds in stock of the new company (capital, $5,000,000) which the Central Trust Company of New York would buy prior to June 3, 1894, at 40 per cent. of its par value; that they would receive for the accrued interest on their deposited bonds from the New York Guaranty & Indemnity Company, on and after May 24, 1894, cash, less 2.35 per cent. for expenses. The notice also stated that the accounts of the committee had been duly audited by the president of the Central Trust Company, in accordance with the terms of the bondholders' agreement.

Upon these pleadings and the testimony, and the facts stated in the answer of the committee, which were admitted to be true, the matter was submitted for final hearing. The circuit court (Judge Simonton) dismissed the petition (71 Fed. 53), and the petitioner, Rosborough, appealed.

S. P. Hamilton, for appellant.
J. E. Burke, for appellees.

Before GOFF, Circuit Judge, and MORRIS, District Judge.

MORRIS, District Judge (after stating the facts). The petitioner, having abandoned any attempt to impeach the sale of the railroad made by the special master under the foreclosure decree of November 23, 1892, claims that, as the holder of one of the first consolidated mortgage bonds, he is entitled to a priority in the distribution of the fund arising from that sale over the other holders of the same issue of bonds who signed the bondholders' agreement and deposited their bonds under its terms, and who had appointed the respondents, Kissel, Smith, and Geddes, a committee to act for them, because, he says, it appears that, by a resale of the property, the bondholders who signed the agreement have obtained what is equivalent to full payment of their bonds and accrued interest. He assigns as error in the decree of the court dismissing his petition that the court should have held that the committee were trustees for all the first consolidated mortgage bondholders, whether they signed the agreement or not, and that the mortgage could not be used by the syndicate of bondholders, or their committee, to secure an unconscientious advantage over the petitioner and others in like situation. He assigns as error, also, that the court refused to hold that, as he had originally held the bonds secured by the mortgage of 1868, of which the court decreed that the outstanding bonds should be paid in full, and as he had surrendered the bonds of 1868 for the one he now holds, the other holders of like bonds should not be per-

mitted to defeat his claim, and he should be restored to his rights under the mortgage of 1868.

The contention on behalf of the appellant which has been most earnestly pressed is that, in their intervention in the foreclosure case, the respondents Kissel, Smith, and Geddes have so acted as to constitute themselves trustees for all the first consolidated mortgage bondholders, and, having used the mortgage to accomplish their ends, and having largely profited by the use of it, they cannot now, in equity and good conscience, exclude any bonds intended to be secured by that mortgage from the fruits of the foreclosure and subsequent resale. It becomes, therefore, necessary to ascertain what was done by the respondents in the foreclosure case, the history of which is set out in Bound v. Railroad Co., 7 C. C. A. 322, 58 Fed. 473, the record of which case, and the record in Ex parte Mitchell & Smith, it is agreed, shall constitute part of the record in this case.

Bound, who filed the original bill, was a holder of second consolidated mortgage bonds, and his bill prayed a foreclosure of that mortgage subject to all priorities. Afterwards a cross bill was filed by Barnes & Sloan, the trustees of the first consolidated mortgage, alleging that under the terms of the mortgage they had declared the principal due for default in the payment of interest, and praying a foreclosure of their mortgage, and a sale clear of all prior liens. Then Messrs. Smith, Kissel, and Martin intervened, and upon their petition were made defendants. They alleged that they were themselves the holders of a large amount of the first consolidated mortgage bonds, and represented other holders, to an amount, in all, of over $3,000,000 of said bonds. They answered the cross bill of Barnes & Sloan on behalf of themselves and all others in like situation who should come in and contribute to the expense. They alleged that the action of said trustees in declaring the principal of the first consolidated mortgage due had been improvident, and against the wishes and the interests of the great majority of the bondholders represented by them, and solely in the interest of the second consolidated mortgage bondholders and junior securities, and had been done by the trustees with the view of forcing the first consolidated mortgage bondholders to take a bond bearing a less rate of interest. They denied that the income of the road was insufficient to pay the 6 per cent. interest payable on the first consolidated mortgage bonds and they prayed that the cross bill of the trustees should be dismissed, and the property sold, as prayed by the original bill, subject to the first consolidated mortgage. Upon final hearing of the case, the court held that it was true that the trustees had acted improvidently, and not solely in the interest of the first consolidated mortgage bondholders, in declaring their bonds due, but that, during the three years' operation of the road by a receiver, it had been shown that, for the reasons stated in the court's opinion, the rights of all the claimants would be most fairly and equitably protected by a sale clear of all incumbrances; and the court so decreed. From this decree Smith and Kissel appealed, claiming that the court should have decreed a sale under the second consolidated

mortgagé only. Their appeal was not sustained, and the decree of the circuit court was affirmed. 7 C. C. A. 322, 58 Fed. 473.

It appears, from these proceedings in the original case, that there were two parties among the holders of the first consolidated mortgage bonds,—those who advocated the policy contended for by Messrs. Smith and Kissel, and those who sustained the policy of the trustees of the mortgage. Smith and Kissel, and those bondholders they represented, contended that the others were favoring the holders of the second consolidated mortgage bonds, and fought them to the end. When the decree directing a sale foreclosing the first consolidated mortgage was affirmed over their appeal, they then advertised for all bondholders who were willing to join them to deposit their bonds and sign the agreement which would give them the authority and financial backing required to bid for the property, and prevent the second consolidated bondholders buying the property at a price which would subject the first consolidated mortgage bonds to a loss. They gave the fullest public notice of the terms of the agreement, and especially of the fact that by its terms the committee was acting solely for the benefit of such bondholders only as should deposit their bonds, and that all the benefits were to be restricted to those who did so deposit and who assented to the agreement. All this, it seems, to us, was perfectly fair and legitimate. There was no attempt whatever to do anything secretly, or anything that was unlawful. It is evident that there was a division among the holders of the first consolidated mortgage bonds, and that the Kissel, Smith, and Geddes committee represented a policy not in harmony with that represented by the mortgage trustees and some others of the first consolidated bondholders. It was open to bondholders to join either camp, but not to remain inactive, except at their own risk. The Kissel, Smith, and Geddes committee succeeded in obtaining the support of holders of $4,252,000 out of the whole $4,883,000 of bonds, and so were in the end in the stronger position to protect those they represented; but, recognizing that none should be excluded who were willing to accept their services, they extended the time for signing the agreement from time to time, and did not refuse to receive any bonds tendered for deposit until the resale of the road to the new company.

It appears that the only reason why the petitioner did not deposit his bond was that he never saw the advertisement of the notice of the committee, and remained in ignorance of it until about 16 months after the resale, and after the committee's accounts were settled up and they were discharged from their trust. This was not the committee's fault. The bonds were not registered, but payable to bearer, and the committee had no means of reaching holders except by the publication of notices in the way most likely to reach them. After the full notice given by them, they had a right to presume that holders who did not join them refrained from doing so from motives of their own. They could not reasonably be expected to hold their settlements open indefinitely, after the resale of the property, for the benefit of persons who presumably were holding off from dis-

trust or inimical reasons, and who had refused or neglected to deposit their bonds, and subject them to the risks of any loss attending the attempt to bid on the property on behalf of the depositors, and to raise money on them to pay the cash required by the terms of sale.

It is urged on behalf of the petitioner that the cases of Jackson v. Ludeling, 21 Wall. 616, and Florida v. Anderson, 91 U. S. 667, are cases like this, in which the supreme court has refused to sanction similar conduct of a portion of the bondholders, by which they excluded other bondholders under the same mortgage from participation in the funds of a foreclosure. In Jackson v. Ludeling, the conduct denounced as fraudulent was a crafty, secret scheme by which the holder of 4 out of 761 outstanding $1,000 bonds had, with the connivance of the president of the corporation, procured the seizure and sale of a railroad property on which $2,000,000 had been expended, and had purchased it in the interest of himself and the directors for $50,000. The sale was made in a remote village of Louisiana, after advertisement in a county newspaper, the bonds being held principally in other states. The parties to the scheme had, just before the sale, corrupted the agent of the holders of about 300 of the bonds into a betrayal of his trust and the sacrifice of the interests intrusted to him. In every step in the proceedings there was apparent the fraudulent design to cheat the great majority of the bondholders under the forms of law,—a design participated in by the officers of the corporation, to whom all the bondholders had a right to look for honest dealing, if not active protection. It was in commenting upon these facts that the supreme court said that one bondholder is a quasi owner, in common with the other bondholders, of whatever rights the mortgage gave, and that the community of interest involved mutual obligation, and that, if he used the mortgage to procure a sale of the security, it was his duty to make it productive of the most that could be obtained for all who were interested in it.

In the present case there was no effort by Smith, Kissel, and Geddes, committee, to procure a sale. On the contrary, they employed counsel, and became responsible for the costs of resisting it, and for the costs and expenses of an appeal from the decree deciding against them. When the sale became inevitable, they, by their representative, attended the sale, and bid for the property for the protection of the interests which had been confided to them. After the purchase they continued by notices to invite all the bondholders who were willing to do so to join with them and share the benefits of the purchase, and they continued this invitation until the property was resold, and the time came for them to make a settlement with their constituents. When a sale of mortgaged railroad property is decreed, an association of bondholders for the protection of their mutual interest is a necessity, and the appointment of a committee to act for them is advisable and customary. Those charged under the terms of such an association with the duty of acting must employ counsel and be responsible for expenses and costs. That one of the terms of being admitted to such an association should be the

deposit of the bonds to be protected is surely most reasonable. If notice of the fullest kind possible is given to all bondholders, and all are invited to come into the association upon the same terms, and the privilege is not withdrawn until there is a really valid reason for doing so, there can be no just complaint by those whose inaction has left them outside that they do not share in the benefits of those who are inside the association, and have taken the risks of its success or failure. Wetmore v. Railroad Co., 1 McCrary, 466–473, 3 Fed. 177.

It is urged that the attorney of the committee who attended the sale acted in such manner as to chill competition and drive off bidders, so as to get the road at the minimum bid. Of this there is no proof. During the evening of the day before the sale, in conversation with those who were interested in the foreclosure, the attorney of the committee stated that he was prepared to bid up to a sum sufficient to pay the first consolidated mortgage bonds in full. This was a fact, and he was under no obligation to conceal it. On the contrary, as it was a fact; and not a mere pretense, the disclosure of it enabled all parties to know what they might expect, and prepare themselves. The validity of the sale is not before us. The only question before us is whether the associated bondholders, or their committee, have so acted towards this petitioner as to give him the equity he is attempting to assert against them.

The other point urged in behalf of the petitioner is that he is entitled to set up his surrendered bonds of the mortgage of 1868. The mortgage of 1868 was made to secure an issue of bonds amounting to £620,000 sterling, all of which, except bonds to the value of about $145,000, had been surrendered and canceled, and the first consolidated mortgage bonds issued in lieu thereof. These exchanges were made in good faith, and it is difficult to see upon what ground the court below could have been asked to set aside the transaction. By the fifteenth clause of the foreclosure decree passed November 23, 1892, it was adjudged that the fund arising from the sale should be applied to the payment of costs and the two prior mortgages in full, and the balance to the payment of the first consolidated mortgage bonds in full, if sufficient, and if not, then pro rata. The petitioner, with all the other first consolidated bondholders, is entitled to that distribution, and he failed to show grounds upon which the circuit court could have granted him more.

The decree is affirmed.