# CALIFORNIA *v.* SOUTHERN PACIFIC COMPANY.

ORIGINAL.

No. 7. Original. Argued December 19, 20, 21, 1894. — Decided March 18, 1895.

This court has no original jurisdiction of a suit between a State on the one side, and citizens of another State and citizens of the same State on the other side.

When an original cause is pending in this court, to be disposed of here in the first instance and in the exercise of an exceptional jurisdiction, it does not comport with the gravity and the finality which should characterize such an adjudication, to proceed in the absence of parties whose rights would be in effect determined, even though they might not be technically bound in subsequent litigations in some other tribunal.

The city of Oakland and the Oakland Water Front Company are so situated in respect of this litigation, that the court ought not to proceed in their

absence; and as, if they were brought in, the case would then be between the State of California, on the one hand, and a citizen of another State and citizens of California on the other, this court cannot, under such circumstances, take original jurisdiction of it.

THE State of California by its attorney general, by leave of court, exhibited its bill in equity in this court against the Southern Pacific Company, a corporation and citizen of Kentucky, on November 6, 1893, and an amended bill of complaint was filed on like leave and with the consent of the defendant, March 5, 1894. The amended bill averred that the State of California was admitted into the Union under an act of Congress approved September 9, 1850, with certain specified boundaries, and it was alleged that said boundaries embraced all the soil of the beds of the bay of San Francisco, and all the arms of that bay, including what was known as San Antonio Creek, sometimes called San Antonio estuary; that the State upon its admission into the Union acquired and continued to retain jurisdiction over the soil of the beds of said bay, including San Antonio Creek, and absolute title to the same, subject only to the right of the United States of supervision over the navigable waters of the bay so far as necessary in exercising its right to regulate commerce with foreign nations and among the several States, and that the State thus possessing the sovereign power over the bay of San Francisco and the San Antonio Creek and the beds thereof had the right to protect and defend the same from infringement and to sue for relief in respect of encroachment or infringement of its sovereign or proprietary rights therein.

The bill further alleged that certain lands, described by metes and bounds and designated as tracts numbered first, second, third, fourth, fifth, sixth, and seventh, were situated in that part of the bay of San Francisco which, together with San Antonio Creek, constituted the harbor of the city of Oakland, in the county of Alameda; that the city of Oakland was situated upon that part of the bay which included said lands and upon San Antonio Creek; that all the lands numbered first, second, third, fourth, fifth, and sixth were situated within the limits of the city of Oakland, and were formerly

situated within the limits of what was the town of Oakland; that that portion of the tract of land numbered seventh, which was situated within the limits of the city of Oakland, was situated within the limits of the town of Oakland; that the lands at the time the State was admitted into the Union extended and now continued to extend (except so far as the defendant or parties under whom it claimed had filled in portions of said land) to a considerable distance under the navigable waters of the bay of San Francisco and of San Antonio Creek to ship channel in said navigable waters and to a depth at ordinary low tide of twenty-four feet; that a large portion of the lands had always been constantly covered by said waters; that the residue of the lands had at all times been covered with navigable waters at ordinary high tide except so far as the defendant and those under whom it claimed had filled in the same; that San Antonio Creek was and always had been navigable, and the government had been and was expending large sums of money in improving the navigation of the creek and bay as a harbor for the city of Oakland; and that the bay of San Francisco was a tidal bay and a large body of navigable water connected with the Pacific Ocean.

It was further averred that the city of Oakland contained a population exceeding sixty thousand inhabitants, which was constantly increasing; that said city fronted upon the tidal waters of the bay and of San Antonio Creek and the lands embraced a large portion of the shore of the bay and of the shores of the creek within the city, and embraced a large portion of the water front of the city upon which landings, wharves, docks, piers, and other structures for the landing, loading, and unloading of vessels at said city could be constructed and maintained; that a large part of the water front of the lands was now required for the erection of wharves, docks, and piers for the use of vessels landing at the city, and the necessity for the use of additional portions of these shores and lands for the purpose aforesaid was constantly on the increase; that there were large portions of the lands and shores that were required for the termini of railroads hereafter seeking to enter the city

of Oakland and to obtain access to said navigable waters for the purpose of connecting with vessels navigating those waters, and of bringing ship and car together. The bill also stated that the city of San Francisco contained a population of three hundred and fifty thousand, and was the largest city on the eastern side of the Pacific Ocean, lying across the bay of San Francisco and opposite the city of Oakland, about a distance of four miles; that the interest of the cities of San Francisco and Oakland and the general public, and the convenience and necessities of commerce, both foreign and domestic, required that the control of the State over these lands and its ownership thereof should be enforced and maintained; that all the commodities and passengers transported between the city of San Francisco and other parts of California and the eastern and other portions of the United States were carried over these lands; that they were situated so as to practically control the harbor of the city of Oakland, and especially that part thereof used in forming a connection between the city of Oakland, by boats on the bay of San Francisco and of San Antonio Creek, with railroads extending eastward; and that the exclusive use and occupation of such land created a monopoly of transportation from the city of San Francisco to other parts of the State of California and the eastern portions of the United States.

The bill further averred that defendant claimed as owner in fee title and right adverse to the State in and to all the tracts of land described and numbered in the bill, and without the consent of the State, and without any right whatever, defendant and those under whom it claimed had taken possession of portions of said tracts numbered 1 and 5, and had filled in parts thereof, and had driven piles in other parts thereof, and had placed on said portions of land railroad tracks and buildings which greatly obstructed the navigation of said waters; that all of said tracts, buildings, and other structures were now being unlawfully maintained by defendant under its claim; that defendant claimed and asserted exclusive control over the lands described in the bill and prohibited all vessels excepting its own and such vessels as carried freight from the railroad of defendant, from landing upon any part of the shore embraced

by these lands; that defendant denied the right of the State to exercise any control over any of these lands, or to authorize the construction of wharves or landings of any kind upon any part of them, or to regulate any wharf built upon said premises, and to collect tolls or wharfage for the use of any part of said premises; that but a small portion of these tracts of land were in the actual occupation or use of defendant, and no part of the tracts numbered 3, 6, and 7 was being occupied or used by defendant.

The bill alleged that the ground on which defendant based its claim was that under and by virtue of an act of the legislature of California, entitled "An act to incorporate the town of Oakland and to provide for the erection of wharves thereat," approved May 4, 1852, (a copy of which act was annexed to the amended bill and marked Exhibit A,) the State granted to the town of Oakland the title to the whole water front of that town, that is to say, all the land lying within its corporate limits between high tide and ship channel, including the lands described in the bill; that the town of Oakland under said act had authority to grant and convey, and did grant and convey, by conveyance absolute and in fee, in 1852, to Horace W. Carpentier all of the said water front of the town of Oakland; that by mesne conveyances from him defendant had become and was the owner in fee simple of the tracts numbered two and four, and that by leases made and delivered to it by persons claiming in fee under and by virtue of mesne conveyances from Carpentier, defendant had acquired and now held an estate for the term of ninety-nine years from the 17th of February, 1885, in all the remaining lands and premises thereinbefore described. And it was further averred that the State did not by the act approved May 4, 1852, or otherwise, convey the water front, or any part thereof, to the town of Oakland, nor place the control of the same in the town, nor divest the State of its control over the water front, nor had the legislature of the State any power or authority to grant the lands to the town or any one, or to divest the State of its control thereof, and that the town did not grant or convey to Carpentier, and had no power or

authority under the act of May 4, 1852, or otherwise, to grant or convey to him any part of the water front of the town of Oakland, and that the said lands at all times since the creation of the State of California had been and now were held in trust by the State for the benefit of the State, and at all times had been and now were incapable of alienation to any person or of being reduced to private ownership.

The bill then proceeded to set forth a number of other claims of defendant in and to the premises adverse to the title of the State, such as decrees to quiet title, conveyances under judgment sales, and sales for taxes, all of which were alleged on various grounds to be of no force or effect as against the State; and it was averred that defendant had not and never had any estate, right, title, or interest in or to the lands or premises, or any part thereof, or any right to the possession of any part thereof; and that the entry upon and use and occupation of the public domain, as set forth, was a purpresture and a public nuisance, and interfered with the control and development of the harbor of Oakland.

It was also alleged that the act entitled "An act to incorporate the town of Oakland, and to provide for the construction of wharves thereat," approved May 4, 1852, c. 107, Sess. Laws 1852, 180, was repealed by an act entitled "An act to incorporate the city of Oakland," passed March 25, 1854, c. 73, Sess. Laws 1854, 183.

The prayer of the amended bill was that "said defendant, the Southern Pacific Company, be required to set forth in its answer the nature of its claim or claims, and that all adverse claims of said defendant to said premises be determined by a decree of this honorable court, and that in and by said decree it be adjudged that your orator is the owner of the whole of said premises and has lawful right to control the same, and that said defendant, Southern Pacific Company, has no estate or interest whatever in or to said premises as against your orator, and no right to the possession of any part thereof, and that the clouds and doubts cast thereby on the title of your orator be removed; that the structures so as aforesaid unlawfully placed upon said premises by said de-

fendant be abated, and that the writ of injunction issue out of this honorable court, and under the seal thereof, commanding the removal thereof, and that said defendant, and all persons claiming or to claim by or under it, be perpetually enjoined, restrained, and debarred from asserting any claim of, interest in, or title to or control over said lands, or any part thereof, adverse to your orator.   That your orator be declared to have the sole and exclusive right to develop and control the said harbor of said city of Oakland, and to dispose of such rights at its pleasure for the interests of the public, and that it be adjudged by said decree that said town of Oakland did not grant or convey, and had no authority to grant or convey, to said Carpentier all the water front of said town, to wit: All the land lying within the corporate limits of said town situated between ordinary high tide and ship channel, or any part thereof, and that by said decree it be further adjudged that the State of California did not and could not grant or convey the said water front, or any part thereof, to the said town of Oakland, and that any control over said water front, if any, that was conferred on said town of Oakland by said act approved May 4, 1852, was revoked and annulled by said act passed March 25, 1854."

On March 6, 1894, the defendant filed its answer, claiming title in fee simple to tracts numbered three and four; a leasehold estate under the Central Pacific Railroad Company, in tracts numbered one, two, six, and seven; and under the South Pacific Coast Railroad Company, in tract numbered five.   The answer admitted that, by virtue of its sovereignty, the State of California became the owner and proprietor of the beds of the bay of San Francisco and San Antonio estuary, but averred that by the grant thereinafter set forth the State lost the proprietary right and title over the described property situated between high-water mark and ship channel in the city of Oakland.   It admitted that the lands were ordinarily below the line of ordinary high tide, but denied that they all continued to lie below that line, and averred that a portion of the land which formerly formed a part of the bay and estuary was now above the high-tide line, having been

filled in and reclaimed by defendant and its grantors and lessors ; that at least one-half of tracts one, five, six, and seven, and nearly all of tracts two, three, and four, were entirely bare at low tide. It denied that any portion of the lands claimed by defendant interfered with the harbor of Oakland or of the city of San Francisco, or hindered or obstructed commerce, or infringed upon or obstructed the practicable navigable waters constituting the harbors of either of those cities ; and averred that all the lands described in the bill except parcel numbered six were occupied by wharves, warehouses, depots, and other structures necessary for the convenience of commerce and navigation, and that all of said structures were used in the interest of the same, and were lawfully erected and maintained.

The answer admitted that the defendant claimed the title and right adverse to the State in and to all the premises particularly described except that portion which was included within the harbor lines of the creek of San Antonio as established by authority of the United States ; and that defendant asserted exclusive control over all of the lands except those outside of the pierhead lines of the harbor, but denied that it prohibited all vessels except its own from landing or excluded any person from using said wharves, although it admitted that it would prohibit any one from using any part of the shores or buildings without defendant's consent or unless compensation was made therefor.

The answer denied the right of the State to exercise any control over any of the lands not covered by navigable waters except governmental, and while admitting that the State had the right to regulate wharves built upon said premises, denied that it had any power to collect wharfage or dockage from the use of any part thereof. The answer denied that the only ground on which defendant based its claim was that by virtue of the act of the legislature of May 4, 1852, the State granted to the town of Oakland the title to the whole of the water front of that town, that is to say, of the land lying within the then corporate limits of the town of Oakland, situated between high tide and ship channel, and which in-

cluded the lands hereinbefore described; but admitted that it was one of the grounds, and insisted that by said act the town of Oakland was vested with the absolute control and ownership of the water front with power to dispose of and convey the same absolutely and in fee simple to any person, and that thereby the State divested itself of all control and supervision over the land as proprietor thereof, and could only control the same politically. And defendant claimed that the town of Oakland under said act had lawful authority to grant and convey and had granted and conveyed, both by ordinances and by a deed of conveyance, the land absolutely in fee to H. W. Carpentier in 1852, and that by mesne conveyances from said Carpentier, defendant became and was the owner in fee simple of the tracts of land described in the bill and numbered third and fourth; that by mesne conveyances from said Carpentier, the Central Pacific Railroad Company became and was the owner in fee simple of the tracts of land described as first, second, sixth, and seventh, and that defendant had a leasehold interest therein; that the South Pacific Coast Railway Company by mesne conveyances from said Carpentier became and was the owner in fee simple of the tract of land numbered fifth in said amended bill of complaint, and that the defendant had a leasehold interest therein. The answer set forth minutely and in detail all the grounds on which defendant rested its claim, and which need not be repeated here.

Replication was filed March 12, 1894, and on the same day the court denied a motion of the city of Oakland for leave to be joined by intervention as co-complainant in the bill, but granted leave to the city to file briefs, accompanied by such documents and maps, illustrative of its alleged title, as it might be advised. On April 30, 1894, an order was made by the court in reference to depositions theretofore placed in the custody of the clerk of the court, together with maps and exhibits, and appointing a commissioner to take testimony herein, instructing him to take and return such testimony as might be offered by either of the parties, and to receive and return such documents and maps illustrative of the alleged title of the city of Oakland as it might deem proper to offer, pursuant to the order of March 12, 1894.

The depositions and exhibits referred to in this order were thereupon opened and filed, and subsequently the evidence adduced before the commissioner and transmitted with his report to the court. This embraced many depositions on both sides and a large number of maps,.papers, and documents. The cause was heard upon pleadings and proofs, December, 19, 20, and 21, 1894.

The record is voluminous, but only so much of the matters disclosed as will tend to explain the nature and scope of the case, chiefly as presented by defendant, need be stated.

The legislature of California on May 4, 1852, c. 107, Sess. Laws 1852, 180, passed an act entitled "An act to incorporate the town of Oakland and to provide for the construction of wharves thereat," the boundaries of the town embracing some 7840 acres of land between high tide and ship channel, 1549 acres of upland, and 493 acres of salt marsh. The corporate duties and powers of the town were vested in a board of trustees, including the usual powers of such municipalities in regard to streets, roads, bridges, wharves, ferries, docks, piers, etc., and the act also provided that "with a view to facilitate the construction of wharves and other improvements, the lands lying within the limits aforesaid, between high tide and ship channel, are hereby granted and released to said town: *Provided*, That said lands shall be retained by said town as common property, or disposed of for the purposes aforesaid." The trustees were chosen as prescribed by the act in May, 1852, and organized as a board thereunder. On the eighteenth of May the board of trustees passed an ordinance entitled "An ordinance for the disposal of the water front belonging to the town of Oakland, and to provide for the construction of wharves," which was engrossed and signed by the president and clerk of the board on May 27, 1852. This ordinance granted in its first section to Horace W. Carpentier and his legal representatives for the period of thirty-seven years the exclusive right and privilege of constructing wharves, piers, and docks at any points within the corporate limits of the town, with the right of collecting wharfage and dockage at such rates as he might deem reasonable, subject to a proviso for the erection of these wharves

within a specified time and at particular locations, and the payment to the town of a certain percentage of the receipts for wharfage; and by its second section granted to him and to his assigns or legal representatives, with the view as expressed therein to more speedily carry out the intentions and purposes of the act of incorporation, and in consideration of the premises and of a contract on Carpentier's part to build for the town a public school-house, "the water front of said town, that is to say, all the land lying within the limits of the town of Oakland between high tide and ship channel, as described in said act, together with all the right, title and interest of the town of Oakland therein;" and by the third section the president of the board of trustees was "charged with the duty of executing, on behalf of the town of Oakland, a grant and conveyance in accordance with the provisions of this ordinance." On May 31, 1852, the president of the board executed and delivered to Carpentier a deed of conveyance, which declared that the president, in conformity to the provisions of the ordinance of May 27, 1852, and in virtue of the authority vested in him by the constitution and laws of California, and especially by the act of May 4, 1852, in his official capacity "as said president and in view of the public convenience," granted to Carpentier the exclusive right and privilege of constructing wharves, etc., with the right of collecting wharfage and dockage for thirty-seven years; and "in consideration of the covenants hereinafter mentioned and of five dollars paid to the town," in obedience to the ordinance aforesaid and by virtue of the authority as aforesaid vested in him as president of the board of trustees, and by virtue of said office, sold, transferred, granted, and released to Carpentier and his legal representatives "all the right, title, and interest of the said town of Oakland in and to the water front of said town, that is to say, all the land lying within the now corporate limits of the town of Oakland and situated between high tide and ship channel as granted to said town by and as described in said above-entitled act," provided that Carpentier or his legal representatives should construct certain wharves within times specified, and also that two per cent of the receipts for wharfage should

be payable to the town of Oakland.    Upon this deed an agree-
ment by Carpentier, under seal, was endorsed, bearing the same
date, covenanting and agreeing to carry out the objects and
purposes of the grant and conveyance, to construct the wharves
as provided for in the deed, and to build for the town a public
school-house, agreeably to the terms of an earlier obligation in
reference thereto.   This conveyance and contract were filed
for record January 12, 1853.    Thereupon Carpentier built one
of the wharves, upon the completion of which the board of
trustees on January 1, 1853, passed a further ordinance enti-
tled "An ordinance to approve the wharf at the foot of Main
Street, and to extend the time for the construction of the other
wharves," which declared that the wharf at the foot of Main
Street had been built and completed to the entire satisfaction
of the board of trustees and according to the terms and within
the time specified in the ordinance of May 18, 1852, accepted
the same and extended the time for the completion of the other
two wharves.   Carpentier constructed a second wharf, and built
and delivered to the town a public school-house conformably to
his contract, and thereafter, and on August 27, 1853, the town
passed another ordinance, ratifying and confirming the origi-
nal ordinance of May 18, 27, 1852, and granting, selling, and
conveying the water front of the town of Oakland "unto the
said Carpentier and his legal representatives, in fee simple for-
ever, with the right to erect wharves, piers, docks, and build-
ings at any and all points thereon, not obstructing navigation,
and to freely use and occupy the lands herein conveyed."    This
ordinance approved of the second wharf as built within the time
and in accordance with the provisions of the preceding ordi-
nances, and accepted and approved of the school-house as com-
pleted to the satisfaction of the board and according to the
terms of the ordinance and contract, and provided that the
third wharf might be built at the foot of another street than
that originally mentioned, which third wharf the evidence
tended to show was subsequently constructed.

On March 25, 1854, c. 73, Sess. Laws 1854, 183, an act of the
legislature of California was approved, entitled "An act to in-
corporate the city of Oakland," which provided in its first sec-

tion that "the corporation or body corporate now existing and known as the town of Oakland, shall remain and continue to be a body politic and corporate by the name of the city of Oakland," and that "the boundaries of said city shall be the same as the boundaries of the present town of Oakland." Section 12 of this act provided: "The corporation created by this act shall succeed to all the legal and equitable rights, claims, and privileges, and be subject to all the legal liabilities and obligations made *bona fide* of the town of Oakland; and the common council shall have full power to maintain suits in the proper courts to recover any right, or interest, or property which may have accrued to the town of Oakland." Section 19 was as follows: "The act entitled 'An act to incorporate the town of Oakland, and to provide for the construction of wharves thereat,' is hereby repealed; and any ordinance of said 'town of Oakland,' providing for the levying and collection of taxes, and directing or authorizing the expenditure of money, or the assumption of any debts or liabilities, are hereby suspended until the organization of the government created by this act." By the fifth section of an act of the legislature of California, approved May 14, 1861, c. 360, Sess. Laws 1861, 367, "amendatory and supplementary to" the act of March 25, 1854, it was provided: "The common council of the city of Oakland is hereby authorized and empowered to ratify and confirm any ordinance or resolution of the board of trustees of the late town of Oakland." On May 15, 1861, c. 377, Sess. Laws 1861, 384, the legislature of the State passed another act to amend the act of March 25, 1854, reincorporating the city of Oakland, the twelfth section of which read as follows: "The corporation created by this act shall succeed to all the legal and equitable rights, claims, and privileges, and be subject to all the legal or equitable liabilities and obligations of the town of Oakland; and the ordinances of the board of trustees of said town are hereby ratified and confirmed, and the common council shall have power to maintain suits in the proper courts to recover any right or interest or property which may have accrued to the town of Oakland."

On March 21, 1868, c. 230, Sess. Laws 1868, 222, the legis-

lature of California passed an act authorizing and empowering the council of the city of Oakland, the mayor concurring, "to compromise, settle, and adjust any. and all claims, demands, controversies, and causes of action in which the said city is interested." On March 27, 1868, the Oakland Water Front Company was organized under an act of the legislature of April 14, 1853, having the objects, among others, "to acquire, build, construct, own, hold, manage, use, and control wharves, docks, basins, dry docks, piers, and warehouses in the city of Oakland and in the vicinity thereof in the State of California, and to lease, sell, convey, grant, mortgage, hypothecate, alienate or otherwise dispose of the same." The council of the city of Oakland on April 1, 1868, passed an ordinance "for the settlement of controversies and disputes concerning the water front of the city of Oakland, the franchises thereof and other matters relating thereto," which ordained that "the claims, demands, controversies, disputes, litigations, and causes of action, heretofore existing between the city of Oakland on the one part, and Horace W. Carpentier and his assigns on the other part, relating to the force, validity, and effect of the ordinance of May 18, 27, 1852, and of the conveyance to Carpentier by the president of the board of trustees, dated May 31, 1852 ; and of the ordinance of the town of January 1, 1853 ; and of the ordinance of August 27, 1853, "are hereby compromised, settled, and adjusted, and the said above-mentioned ordinances and conveyances are made valid, binding, and ratified and confirmed, and all disputes, litigations, controversies, and claims in and to the franchises and property described in said ordinances and deed of conveyance, and every part thereof, are abandoned and released by the said city of Oakland to the said Carpentier and his assigns, upon the following conditions, to wit, that the said Carpentier and his assigns shall convey by proper and sufficient deeds of conveyance all the property and franchises mentioned and described in said ordinances and deeds of conveyance hereinbefore referred to, to the Oakland Water Front Company, to be used and applied in accordance with the terms, conditions, stipulations, and agreement contained in certain contracts between

the said Oakland Water Front Company and the Western Pacific Railroad Company and other parties, bearing even date herewith, with the exceptions in the said agreement specified."

On April 2, 1868, the council passed another ordinance entitled " An ordinance finally settling, adjusting, and compromising the question of the water front," reciting that it appearing that all the terms and conditions of the previous ordinances had been fully satisfied and complied with by Carpentier and his assigns, all the ordinances and deed therein mentioned and described were finally ratified and confirmed, and all disputes, controversies, causes of action, between the city and Carpentier and his assignees, were released to the said Carpentier and his assigns, " provided, that nothing herein contained shall release the right of the city of Oakland to the reversion of the property, franchises, and rights released, as provided in the contract between the Western Pacific Railroad Company and the Oakland Water Front Company, in case said city of Oakland shall become entitled to the same under said contract." The contracts mentioned in the first ordinance were a contract between the Oakland Water Front Company, the Western Pacific Railroad Company, the city of Oakland, Horace W. Carpentier, John B. Felton, and Leland Stanford, not in fact executed by the city of Oakland; and a contract between the Western Pacific Railroad Company, Stanford, and the Oakland Water Front Company. The first contract recited the deed, dated March 31, 1868, acknowledged April 1, 1868, of Horace W. Carpentier to the Oakland Water Front Company for the water front property, and that " the said deed was executed to the Oakland Water Front Company, upon the express trusts, and subject to the covenants and agreements herein set forth." By this contract it was provided that the Western Pacific Railroad Company should select from and locate upon the premises described in the deed from Horace W. Carpentier to the Oakland Water Front Company five hundred acres of land in one or two parcels ; that it should have frontage on ship channel not exceeding one-half mile in length ; and also select and locate within said time, over the

remainder of said premises, certain right of way; and the Oakland Water Front Company, on its part, covenanted, that it would at any time after such selection and location, upon demand, convey by proper conveyances the said five hundred acres and the right of way aforesaid, and that such conveyance or conveyances should contain a covenant that if the parcels, or either of them, should be located out to a westerly water front of twenty-four feet of depth of water at low tide, no lands should be sold westerly therefrom, and no obstruction or impediment should ever be placed or put in front or westerly of the same, or anything be done to prevent the free and unobstructed approach of vessels to said parcels. It was further covenanted on the part of the Oakland Water Front Company that it would, upon demand, convey to the city of Oakland a certain described part of the premises; and that it would, within a reasonable time, designate and dedicate as a navigable water front for public use the channel of San Antonio Creek from ship channel to the town of San Antonio, stating the width. In the contract between the Western Pacific Railroad Company, Stanford, and the Oakland Water Front Company, the Western Pacific Railroad Company covenanted that, upon conveyance being made to it, so as to vest a good title in fee simple in said company, and upon the performance and execution by the municipal authorities of the city of Oakland of all instruments, ordinances, acts and proceedings necessary to perfect, complete, and make good the title to said premises described in said deed from said Carpentier to said Oakland Water Front Company, within a reasonable time and with reasonable dispatch, it would proceed and construct, or purchase and complete, a railroad connection from its main line to the said parcels thus selected by it, or one of them, and would, within said time, complete such connecting railroad thereto, and would construct on said parcels, or one of them, the necessary buildings and structures for a passenger and freight depot, and would expend, within three years, not less than five hundred thousand dollars upon said premises, and if it should fail, or neglect or refuse to do the same within three years, that the five hundred acres of land, thus conveyed,

should be forfeited and should be conveyed by the company to the city of Oakland.

By deed dated March 31, 1868, and acknowledged April 1, 1868, Horace W. Carpentier conveyed to the Oakland Water Front Company, its successors or assigns, the water front to the city of Oakland, and the rights and franchises therein mentioned. The Oakland Water Front Company by deed dated January 12, 1869, conveyed to the city of Oakland the land agreed to be conveyed in the above contract. The Oakland Water Front Company, July 12, 1879, dedicated for the purposes of a harbor and navigable water course nearly the whole of the estuary of San Antonio and to the fullest extent all the land in the estuary set aside by the government for harbor purposes. On July 27, 1870, the Oakland Water Front Company conveyed to the Western Pacific Railroad Company the tract of land on the water front selected and located by it for railroad purposes under the terms of the contract of April 1, 1868, as desired and required by the city of Oakland, and these are tracts one and six and a portion of five. The Western Pacific Railroad Company in 1868 or 1869 established its terminus on tract first, built a long wharf and station at the end of it, with buildings, docks, wharves, and depot for passengers and freight by vessels and ferryboats. Tract second was conveyed by the Oakland Water Front Company to the Central Pacific Railroad Company on May 3, 1878. The greater portion of this tract is occupied by a slip for freight steamers, and the tracts and appurtenances necessary in handling freight cars. Large sums of money were expended by the railroad companies, and the fulfilment of conditions on their part may be assumed. The area of the seven tracts embraced 838 acres. It was stipulated that the Central Pacific Railroad Company since the year 1870 had been, and still was, a corporation organized and existing under the laws of the State of California, by the consolidation and amalgamation of the Central Pacific Railroad Company, of California, the Western Pacific Railroad Company, San Francisco and Oakland Railroad Company, San Francisco and Alameda Railroad Company, and other railroad companies, all theretofore organized and doing business under

the laws of the State of California; that the South Pacific Coast Railway Company since the year 1887 had been, and still was, a corporation organized and existing under the laws of the State of California; that the Oakland Water Front Company was organized as a corporation under and in pursuance of its articles of incorporation set forth in the record, and was created for the purposes therein specified as such corporation and none other, and had ever since existed, and still existed, under such articles, and none other, under the laws of the State of California; that the defendant, Southern Pacific Company, was a corporation, citizen, and resident, as set forth in the original and amended bills of complaint; that the different pieces or parcels of land described were parts and portions of the bay of San Francisco and of San Antonio estuary, and in their natural state were covered by their waters at ordinary high tide, and were so at the time California was admitted into the Union; that tracts first, second, third, fourth, fifth, sixth and seventh were separated from the upland by the patent line of the Mexican grant known as the Peralta grant, confirmed by the United States to the heirs of Peralta, which line was designed as meandering along the line of ordinary high tide; that the Central Pacific Railroad Company was the owner of the upland down to the Peralta grant line in front of tracts first, second, and seventh, and was the owner of an undivided one-half interest in the upland down to the Peralta line fronting upon tract sixth; that the Central Pacific Railroad Company leased all of said tracts of land, both upland and tide water, to defendant, Southern Pacific Company, on February 17, 1885, for a period of ninety-nine years, and the Southern Pacific Company ever since that time had been in the actual occupancy of tracts first and second; that the Southern Pacific Company was the owner of the upland in front of and bounded by tract third and in the actual occupation thereof; that said company was not the owner of any upland adjoining tract fourth, but was in the actual occupancy of that tract; that the South Pacific Coast Railway Company was the owner of at least an undivided one-half interest in the upland down to the Peralta grant line in front of tract fifth, and that

company, on July 1, 1887, leased that tract together with the upland, to defendant, Southern Pacific Company, for a term of ninety-nine years, and ever since that time said.Southern Pacific. Company had been occupying and using said tract; that defendant, Southern Pacific Company, acquired by mesne conveyances, from Horace W. Carpentier, all the right, title, and interest of Carpentier, if any he had, in and to tracts third and fourth; that the South Pacific Coast Railway Company acquired by like conveyances, such interest, if any there were, to tract fifth; and that the Central Pacific Railroad Company had acquired, by like conveyances, such interest, if any, to tracts first, second, sixth and seventh. Certain proceedings and decree in a suit in 1857, between the city of Oakland and Carpentier, were also put in evidence; also a sheriff's deed to one Watson dated April 24, 1856, purporting to convey the water front; also tax deed dated October 14, 1871, to Thomas Lemon, on judgment for taxes against the Oakland Water Front Company and the water front of the city of Oakland; also tax deed dated May 14, 1880, of the water front to Watson. It was agreed that whatever right, title, or interest was acquired through these deeds, or either of them, became vested by mesne conveyances in the Central Pacific Railroad Company, as to tracts first, second, sixth, and seventh; in defendant, Southern Pacific Company, as to tracts third and fourth; and in the South Pacific Coast Railway Company as to tract fifth.

On July 12, 1882, the council of the city of Oakland passed an ordinance directing the withdrawal of defences in certain cases and the filing of a disclaimer of any interest or estate in the property described therein, and the discontinuance of an action in which the city of Oakland was plaintiff and the Oakland Water Front Company and others were defendants, with a stipulation that the Oakland Water Front Company might have a final judgment and decree quieting its title to the land described in its cross-bill of complaint, provided that the reversion of the city to collect wharfage, tolls, and dockage at the expiration of the original grant to Carpentier should not be affected; and further providing that all claims, demands, controversies, actions, and causes of action against

the Central Pacific Railroad Company and the Oakland Water
Front Company, or against either of them, in which the city
of Oakland was interested, were thereby released, compro-
mised, settled, and adjusted forever.   Certain decrees in the
suits referred to in the ordinance, quieting title to the tracts
in the Central Pacific, the Oakland Water Front Company,
and Huntington, as against the city of Oakland, are in the
record.

*Mr. W. H. H. Hart*, Attorney General of the State of
California, opened for plaintiff.   *Mr. Aylett R. Cotton* was on
his brief.

*Mr. William M. Stewart* for defendant.

*Mr. J. Hubley Ashton* for defendant.

*Mr. John S. Miller* and *Mr. William R. Davis* as *amici
curiæ*, and as counsel for the city of Oakland.   *Mr. James
A. Johnson, Mr. William Luir Hill, Mr. Edward J. Pringle*,
and *Mr. H. A. Powell* were on their brief.

*Mr. Harvey S. Brown* filed a brief for defendant.

*Mr. John K. Cowen* for defendant.   *Mr. Hugh L. Bond, Jr.*,
was on his brief.

*Mr. William H. H. Hart*, Attorney General of the State of
California, closed for plaintiff.

MR. CHIEF JUSTICE FULLER, after stating the case, delivered
the opinion of the court.

By the third of our general rules it is provided: "This
court considers the former practice of the courts of king's
bench and of chancery, in England, as affording outlines for the
practice of this court; and will, from time to time, make such
alterations therein as circumstances may render necessary."
108 U. S 574.   This rule is, with the exception of some slight
verbal alterations and the addition of the word "former" before

the word "practice" in the first line, the same as original general rule seven, adopted August 8, 1791.  1 Cranch, xvii; 2 Dall. 411.  And in cases of original jurisdiction it has been determined that this court will frame its proceedings according to those which had been adopted in the English courts in analogous cases, and that the rules of court in chancery should govern in conducting the case to a final issue, *Rhode Island* v. *Massachusetts,* 12 Pet. 657; 13 Pet. 23; 14 Pet. 210; 15 Pet. 233; *Georgia* v. *Grant,* 6 Wall. 241; although the court is not bound to follow this practice when it would embarrass the case by unnecessary technicalities or defeat the purposes of justice. *Florida* v. *Georgia,* 17 How. 478.

It was held in *Mallow* v. *Hinde,* 12 Wheat. 193, 198, that where an equity cause may be finally decided between the parties litigant without bringing others before the court who would, generally speaking, be necessary parties, such parties may be dispensed with in the Circuit Court if its process cannot reach them or if they are citizens of another State; but if the rights of those not before the court are inseparably connected with the claim of the parties litigant so that a final decision cannot be made between them without affecting the rights of the absent parties, the peculiar constitution of the Circuit Court forms no ground for dispensing with such parties.  And the court remarked : "We do not put this case upon the ground of jurisdiction, but upon a much broader ground, which must equally apply to all courts of equity whatever may be their structure as to jurisdiction.  We put it upon the ground that no court can adjudicate directly upon a person's right, without the party being actually or constructively before the court."

In *Shields* v. *Barrow,* 17 How. 130, the subject is fully considered by Mr. Justice Curtis speaking for the court.  The case of *Russell* v. *Clarke's Executors,* 7 Cranch, 98, is there referred to as pointing out three classes of parties to a bill in equity : "1. Formal parties.  2. Persons having an interest in the controversy, and who ought to be made parties, in order that the court may act on that rule which requires it to decide on, and finally determine the entire controversy, and do com-

plete justice, by adjusting all the rights involved in it. These persons are commonly termed necessary parties; but if their interests are separable from those of the parties before the court, so that the court can proceed to a decree, and do complete and final justice, without affecting other persons not before the court, the latter are not indispensable parties. 3. Persons who not only have an interest in the controversy, but an interest of such a nature that a final decree cannot be made without either affecting that interest, or leaving the controversy in such a condition that its final termination may be wholly inconsistent with equity and good conscience." Reference is made to the act of Congress of February 28, 1839, c. 36, 5 Stat. 321, and the 47th rule of equity practice. The first section of the statute, carried forward into section 738 of the Revised Statutes, enacted: "That where, in any suit at law or in equity, commenced in any court of the United States, there shall be several defendants, any one or more of whom shall not be inhabitants of, or found within the district where the suit is brought or shall not voluntarily appear thereto, it shall be lawful for the court to entertain jurisdiction, and proceed to the trial and adjudication of such suit between the parties who may be properly before it; but the judgment or decree rendered therein shall not conclude or prejudice other parties, not regularly served with process, or not voluntarily appearing to answer; and the non-joinder of parties who are not so inhabitants, or found within the district, shall constitute no matter of abatement, or other objection to said suit." But Mr. Justice Curtis remarked that while the act removed any difficulty as to jurisdiction between competent parties regularly served with process, it did not attempt to displace that principle of jurisprudence on which the court rested *Mallow* v. *Hinde*, and so far as the 47th rule was concerned, that was only a declaration for the government of practitioners and courts of the effect of the act of Congress and of the previous decisions of the court on the subject of that rule. And Mr. Justice Curtis added: " It remains true, notwithstanding the act of Congress and the 47th rule, that a Circuit Court can make no decree affecting

the rights of an absent person, and can make no decree between the parties before it, which so far involves or depends upon the rights of an absent person that complete and final justice cannot be done between the parties to the suit without affecting those rights. To use the language of this court, in *Elmendorf* v. *Taylor*, 10 Wheat. 167: 'If the case may be completely decided, as between the litigant parties, the circumstance that an interest exists in some other person, whom the process of the court cannot reach, as if such party be a resident of another State, ought not to prevent a decree upon its merits.' But if the case cannot be thus completely decided, the court should make no decree."

Mr. Daniell thus lays down the general rule: "It is the constant aim of a court of equity to do complete justice by deciding upon and settling the rights of all persons interested in the subject of the suit, so as to make the performance of the order of the court perfectly safe to those who are compelled to obey it, and to prevent future litigation. For this purpose all persons materially interested in the subject, ought generally, either as plaintiffs or defendants, to be made parties to the suit, or ought by service upon them of a copy of the bill, or notice of the decree to have an opportunity afforded of making themselves active parties in the cause, if they should think fit." 1 Dan. Ch. Pl. and Pr. 4th Am. ed. 190.

The rule, under some circumstances, not important to be considered here, may be dispensed with when its application becomes extremely difficult or inconvenient. Equity Rule 48.

Sitting as a court of equity we cannot, in the light of these well-settled principles, escape the consideration of the question whether other persons who have an immediate interest in resisting the demand of complainant are not indispensable parties or, at least, so far necessary that the cause should not go on in their absence. Can the court proceed to a decree as between the State and the Southern Pacific Company, and do complete and final justice, without affecting other persons not before the court, or leaving the controversy in such a condition that its final termination might be wholly inconsistent with equity and good conscience?

The boundaries of the State of California, as defined and established in the constitution under which the State was admitted into the Union, by the act of Congress approved September 9, 1850, embraced all the soil of the beds of the bay of San Francisco and the arms of the bay, including what was and is known as San Antonio estuary or San Antonio Creek, on the eastern side of the bay opposite to San Francisco. The tide ebbs and flows naturally in the estuary, which contains a natural tidal basin, and the bay and estuary are connected with the waters of the Pacific Ocean by the Golden Gate.

· The contention of the State was that the legislature did not have the power to grant the water front to the town of Oakland, nor to any one, so as to create any title or interest in the grantee; nor to authorize the town to grant the entire water front to any person to be held and owned as his private property; that the act of May 4, 1852, did not authorize the town to grant its water front, namely, the lands lying within the limits of that town between high tide and ship channel, to Carpentier, nor to any one to be held as private property; that the ordinance of May 27, 1852, was not designed to confer on Carpentier an interest in the Oakland water front beyond thirty-seven years; that the ordinance was against public policy and void; that the deed of the president of the board of trustees was his individual deed, and, if valid, only conveyed for the life of Carpentier, because it did not run to him and his heirs; that the alleged grant was not consistent with the policy of the State; that the grant was revoked by the act of March 25, 1854, and was not confirmed by the act of May 15, 1861; that the act of March 21, 1868, did not authorize the city of Oakland to convey away the water front or to settle existing controversies in that way; that such a settlement would be contrary to public policy and contrary to the charter of the city.

The defendant contended that it is the settled law of this country that the ownership of and dominion and sovereignty over lands covered by tide waters belong to the respective States within which they are found, with the consequent right

to use or dispose of any portion thereof when that can be done without substantial impairment of the interests of the public in such waters, and subject to the paramount right of Congress to control their navigation so far as might be necessary for the regulation of commerce ; that the State of California, in and by the act of May 4, 1852, made an irrevocable grant *in præsenti* to the town of Oakland of the title and property in all the lands lying within the corporate limits of the town between high tide and ship channel, with the power and right to alien and convey the lands or any part of them for the purposes contemplated by the act ; that the act of March 25, 1854, did not, by its own terms or otherwise, operate as a repeal of that grant ; that the grant was confirmed and ratified by the legislature of California by the act of May 15, 1861, and by the council of the city of Oakland by and under the authority of the act of March 21, 1868 ; that the grant was made in pursuance of the settled policy of the State, and created no interference with or impairment to the bay of San Francisco, nor impaired or interfered with the interests of the public in the waters of that bay or any part thereof, or with the legislative power of the State to regulate or use all the waters in behalf of the public for the purposes of navigation. It was further contended that the State was estopped from denying the effect of the act of May 4, 1852, to convey and pass a valid title to the lands embraced by it to the town of Oakland, and estopped by the acts of May 15, 1861, and of March 25, 1868, respectively, to deny the validity of the title of Carpentier and those claiming under him ; and that the city of Oakland was also estopped to deny the effect of the ordinances of the town of Oakland of May 27, 1852 ; January 1, 1853 ; August 27, 1853 ; and of the deed of conveyance by the president of the board of trustees of the town, to grant and convey a valid title in fee simple in the lands in controversy to Carpentier by the operation of the ordinances of the city of April 1 and 2, 1868, under the act of the legislature of March 21, 1868, authorizing the city to settle its controversies with Carpentier. And further, that the confirmation of the ordinances and deed of the town of Oakland by the ordi-

nances of the city of Oakland under the act of 1868, besides again validating the ordinances and the deed of conveyance of the town, operated as a grant by the city of Oakland and the State of California of the land in fee simple absolute to the Oakland Water Front Company as grantee or alienee of Carpentier.

On behalf of the city of Oakland, which was permitted to be heard at the bar by counsel as *amici curiæ*, it was insisted that the original grant of the water front to the town of Oakland had never been revoked; that the city was simply the town's successor in that regard; and that its rights thereunder, of whatever nature, had in no manner been affected by any exertion of the legislative power of the State. Admitting that a municipal corporation as such has no proprietary interest or riparian rights in tide lands situated within its corporate limits, the city claimed that title had passed to it from the State; that, regarded as holding in trust as a governmental agency, nevertheless it had an interest in the grant of individual advantage, and that, in any view, as an existing corporate entity clothed with powers to be locally exercised, though for the general public good, it could not be divested thereof in the absence of legislation to that end by proceedings in which it was not allowed to participate as a litigant. But counsel for the State argued that whatever construction might be put upon the acts of the legislature relating to the city of Oakland, in connection with the water front, the State retained its sovereign power to preserve it for the use of the public free from obstruction, and could alone, by its attorney general, maintain the action; that the city was no more interested in the suit directly or collaterally than any administrative agency would be; that the grant by the act of May 4, 1852, was not in absolute ownership, but in trust for improvement; and that the grant was revoked by the repeal of the act of May 4, 1852, by section 19 of the act of March 25, 1854.

The prayer of the bill was, among other things, for a decree adjudging that the State could not make such a grant to the town; that the town of Oakland had no authority to grant or convey all its water front or any part thereof; and that any

control conferred on the town by the act of 1852 was annulled by the act of 1854.

But it was said that, notwithstanding the breadth of the prayer, relief, if accorded, would be confined to the seven specified parcels, and that the decree would not bind those claiming interests in other parts of the water front, although as to the particular parcels, defendant's lessors, the Central Pacific Railroad Company and the South Pacific Coast Railway Company and its grantor, the Oakland Water Front Company, all corporations and citizens of California, would be bound. Considered, however, in reference to the main contention of the State, namely, the want of power to make the grant of the entire water front at all, the argument treated the water front as one and indivisible for the purposes of the case. Indeed, it was insisted that even if it were conceded that the legislature could empower a municipality to deal with parts of its water front in the interest of the public by authorizing the construction of improvements to a certain extent, creating so far a proprietary interest in those thus authorized, yet that such action as to portions of the grant, though sustainable if independent thereof, must be regarded as involved in the invalidity of the entire grant. Irrespective, then, of the extent, technically speaking, of the effect and operation of a decree as to the seven parcels, based on that ground, as *res adjudicata*, it is impossible to ignore the inquiry whether the interests of persons not before the court would be so affected and the controversy so left open to future litigation as would be inconsistent with equity and good conscience.

Without questioning in any way the authority of the attorney general of the State of California to institute this suit, it is admitted that it was not directed to be commenced by any act of the legislature of that State. If this court were of opinion that the city of Oakland occupied the position of the successor merely of the town of Oakland; that the grant of the water front to the town was as comprehensive as is claimed by defendant, and that it had not been annulled by any act of the legislature, but also held that the State had no power to make such grant, then the city of Oakland would be deprived

of the rights it claims under the grant, not by the exercise of the legislative power of the State as between it and its municipality, but by a judicial decree in a suit to which the city was not a party.

And if the proceedings which purported to vest title in the Oakland Water Front Company were held ineffectual for the same reason, then the latter company would find the foundation of its title swept away in a suit to which it also was not a party.

This is not an action of ejectment or of trespass *quare clausum*, but a bill in equity, and the familiar rule in equity, as we have seen, is the doing of complete justice by deciding upon and settling the rights of all persons materially interested in the subject of the suit, to which end such persons should be made parties.

We are constrained to conclude that the city of Oakland and the Oakland Water Front Company are so situated in respect of this litigation that we ought not to proceed in their absence.

When, heretofore, the city of Oakland applied to be made a co-complainant herein, the question of parties was necessarily suggested, although that application was such, and presented at such a stage of the case, that the court was neither called on to, nor could properly, deal with the general subject. As original jurisdiction only subsisted in that the State was party, and the moving party, (Eleventh Amendment; *Hans* v. *Louisiana*, 134 U. S. 1,) the motion of the city was denied. But we at the same time granted leave to the city to file briefs, accompanied by such maps and documents illustrative of its alleged title as it might be advised. The matter was thus left to the consideration of counsel as to whether indispensable or necessary parties had not been joined, while if the case was permitted to go to a hearing the court would then be able to dispose of it understandingly. We may add, that even if reference could be made to the 47th rule in equity by way of analogy, that rule does not apply when indispensable parties are lacking, and that in respect of necessary parties the cause may or may not be proceeded in without

them, as the court may determine in the exercise of sound discretion. We have no hesitation in holding that when an original cause is pending in this court to be disposed of here in the first instance and in the exercise of an exceptional jurisdiction, it does not comport with the gravity and finality which should characterize such an adjudication to proceed in the absence of parties whose rights would be in effect determined, even though they might not be technically bound in subsequent litigation in some other tribunal.

This brings us to consider what the effect would be if the Oakland Water Front Company and the city of Oakland were made parties defendant. The case would then be between the State of California on the one hand and a citizen of another State and citizens of California on the other. Could this court exercise original jurisdiction under such circumstances?

By the first paragraph of section two of article III of the Constitution it is provided that "the judicial power shall extend to all cases, in law and equity, arising under this Constitution, the laws of the United States, and treaties made, or which shall be made, under their authority; to all cases affecting ambassadors, other public ministers and consuls; . . . to controversies to which the United States shall be a party; to controversies between two or more States; between a State and citizens of another State; between citizens of different States . . ." And by the second clause that "in all cases affecting ambassadors, other public ministers and consuls, and those in which a State shall be party, the Supreme Court shall have original jurisdiction. In all the other cases before mentioned, the Supreme Court shall have appellate jurisdiction . . ." The language, "in all cases in which a State shall be party," means in all the cases above enumerated in which a State shall be a party, and this is stated expressly when the clause speaks of the other cases where appellate jurisdiction is to be exercised. This second clause distributes the jurisdiction conferred in the previous one into original and appellate jurisdiction, but does not profess to confer any. The original jurisdiction depends solely on the character of

the parties, and is confined to the cases in which are those enumerated parties and those only. Among those in which jurisdiction must be exercised in the appellate form are cases arising under the Constitution and laws of the United States. In one description of cases the character of the parties is everything, the nature of the case nothing. In the other description of cases the nature of the case is everything, the character of the parties nothing. *Cohens* v. *Virginia*, 6 Wheat. 264, 393.

By section 13 of the Judiciary Act of September 24, 1789, c. 20, 1 Stat. 73, it was provided " that the Supreme Court shall have exclusive jurisdiction of all controversies of a civil nature where a State is a party, except between a State and its citizens, and except also between a State and citizens of other States or aliens, in which latter case it shall have original but not exclusive jurisdiction. In all the other cases above mentioned the Supreme Court shall have appellate jurisdiction. . . ." This was carried forward into section 687 of the Revised Statutes. Under the Constitution the cases in which a State may be a party are those between two or more States; between a State and citizens of another State; between a State and foreign States, citizens, or subjects; and between the United States and a State, as held in *United States* v. *Texas*, 143 U. S. 621. By the Constitution and according to the statute this court has exclusive jurisdiction of all controversies of a civil nature where a State is a party, but not of controversies between a State and its own citizens, and original but not exclusive jurisdiction of controversies between a State and citizens of another State or aliens.

In *Pennsylvania* v. *Quicksilver Company*, 10 Wall. 553, it was ruled that a State might bring an original suit in this court against a citizen of another State, but not against one of its own, and it has never been held that the court could take original jurisdiction of controversies between a State and citizens of another State and its own citizens.

In *Georgia* v. *Brailsford*, 2 Dall. 402, the State of Georgia filed a bill in equity in this court against Brailsford and others, copartners, who were aliens, and Spalding, a citizen

of Georgia, against whom they had obtained judgment, to restrain payment thereof to Brailsford & Company, upon the ground that the bond on which judgment had been recovered belonged to the State, Spalding having refused to sue out a writ of error. The question of jurisdiction, as presented in the case at bar, does not appear to have been suggested. And the bill, without that question being considered, was finally dismissed, because the remedy of complainant was at law. 2 Dall. 415. An action at law was brought accordingly against Brailsford and others, but not against Spalding, and resulted in a verdict for the defendant. 3 Dall. 1.

In *Florida* v. *Anderson*, 91 U. S. 667, 676, a bill in equity was filed by Florida against citizens of Georgia, and the marshal of the United States for the Northern District of Florida was made a formal defendant by reason of having in his hands an execution at the suit of some of the other defendants. Jurisdiction was sustained on the ground that the marshal was merely a formal party against whom no relief was sought.

In *Wisconsin* v. *Duluth*, 96 U. S. 379, the bill was originally filed against the city of Duluth as a corporation of the State of Minnesota and the Northern Pacific Railroad Company, a corporation organized under an act of Congress, but was dismissed as to the latter before the final hearing, and no question of the jurisdiction of the court over the company was passed upon.

These and other cases were considered in *Wisconsin* v. *Pelican Insurance Company*, 127 U. S. 265, in which it was held that this court had not original jurisdiction of an action by a State upon a judgment recovered by it in one of its own courts against a citizen or corporation of another State for a pecuniary penalty for a violation of its municipal law.

It was asserted in argument that in respect of the clause extending the judicial power " to controversies between citizens of different States," it had been decided that it is within the power of Congress to confer upon the Circuit Courts of the United States jurisdiction over controversies between a citizen of one State and a citizen of another State joined with a citizen of the plaintiff's State, and that the same rule of construc-

tion must be applied to controversies between "a State and citizens of another State."

But the decisions referred to relate to the removal of cases from state courts and, prior to the act of March 3, 1875, c. 137, 18 Stat. 470, the uniform ruling was that all of the necessary parties on one side of the suit should be citizens of different States from those on the other; while under that act it has been always held that in order to justify the removal of a suit because of "a controversy which is wholly between citizens of different States," the whole subject-matter of the suit must be capable of being finally determined between them, and complete relief afforded as to the separate causes of action, without the presence of other persons originally made parties to the suit, and that when there was but one indivisible controversy between the plaintiff and the defendants the suit could not be removed by one of several plaintiffs or defendants. Whether the act of March 3, 1887, c. 373, 24 Stat. 552, as corrected by the act of August 13, 1888, c. 866, 25 Stat. 434, permits one of two or more defendants to remove any case which he could not have removed under earlier statutes is a question upon which no opinion has as yet been expressed by this court. *Hanrick* v. *Hanrick*, 153 U. S. 192 ; *Cotton Press Company* v. *Insurance Company*, 151 U. S. 368, 382; *Torrence* v. *Shedd*, 144 U. S. 527, 530.

It was also contended that the clause of the Constitution extending the judicial power to controversies "between citizens of different States" was intended to secure the citizen against local prejudice which might injure him if compelled to litigate his controversy with another in the tribunal of a State not his own, and that for the attainment of this object Congress could have vested the Circuit Court with original jurisdiction, although some of the defendants were citizens of the same State with the plaintiff; that a single Federal principle or ground of jurisdiction would be sufficient to the exercise of the power to confer such authority; and that the Federal ingredient existed here in the necessity for an impartial tribunal in suits to which a State is a party; and that, moreover, the jurisdiction in the case at bar did not rest exclusively on a con-

troversy between the State of California and a citizen of another State, but that it was one arising under the Constitution in that the effect claimed by the State for the act of March 25, 1854, involves the decision of the question whether that act was a law impairing the obligation of a contract and therefore invalid, and also that a question under the same constitutional prohibition arises in regard to ordinances of the city of Oakland repealing the settlement ordinances of 1868 and all others purporting to dispose of the land in question.

We are aware of no case in which this court has announced the conclusion that power is conferred on Congress to authorize suits against citizens of other States joined with citizens of the same State as that of which plaintiff is a citizen to be originally commenced in, or to be removed to, the Circuit Courts, as arising under the Constitution on the ground indicated, where there is no separable controversy or the citizens of plaintiff's State are indispensable parties, but we are not called on to consider that question, or whether any Federal question is involved, since the original jurisdiction of this court in cases between a State and citizens of another State rests upon the character of the parties and not at all upon the nature of the case.

If, by virtue of the subject-matter, a case comes within the judicial power of the United States, it does not follow that it comes within the original jurisdiction of this court. That jurisdiction does not obtain simply because a State is a party. Suits between a State and its own citizens are not included within it by the Constitution; nor are controversies between citizens of different States.

It was held at an early day that Congress could neither enlarge nor restrict the original jurisdiction of this court, *Marbury* v. *Madison*, 1 Cranch, 137, 173, 174, and no attempt to do so is suggested here. The jurisdiction is limited and manifestly intended to be sparingly exercised, and should not be expanded by construction. What Congress may have power to do in relation to the jurisdiction of Circuit Courts of the United States is not the question, but whether, where the Constitution provides that this court shall have original

jurisdiction in cases in which the State is plaintiff and citizens of another State defendants, that jurisdiction can be held to embrace a suit between a State and citizens of another State and of the same State. We are of opinion that our original jurisdiction cannot be thus extended, and that the bill must be dismissed for want of parties who should be joined, but cannot be without ousting the jurisdiction.

*Bill dismissed.*

Mr. JUSTICE FIELD concurring. It is greatly to be regretted that the controversies between the State of California, the Southern Pacific Railway Company, and the city of Oakland cannot now, in view of the limited character of the original jurisdiction of the Supreme Court of the United States, be heard, determined, and settled by this court, for those controversies will be a fruitful source of disturbance and vexation to the interests of the State until they are thus determined and settled. But, from the views of the court expressed in its recent decision, proceedings for such determination and settlement must find their commencement in the courts of the State, and can only reach this court from their decision upon appeal or writ of error. And the sooner proceedings are taken to reach that disposition of the controversies the earlier will be their final settlement.

Mr. JUSTICE HARLAN, with whom concurred Mr. JUSTICE BREWER, dissenting.

In my judgment it is competent for the court, in the exercise of its original jurisdiction, to proceed to a final decree in this cause that will determine the present controversy between the State of California and the Southern Pacific Company.

By the second section of the third article of the Constitution it is declared that the judicial power of the United States shall extend "to all cases in law and equity, arising under this Constitution, the laws of the United States, and treaties made, or which shall be made, under their authority; to all cases affecting ambassadors, other public ministers and consuls;

to all cases of admiralty and maritime jurisdiction; to controversies to which the United States shall be a party; to controversies between two or more States, between a State and citizens of another State, between citizens of different States, between citizens of the same State claiming lands under grants of different States, and between a State or the citizens thereof and foreign States, citizens, or subjects." And it is provided in the same section that "in all cases affecting ambassadors, other public ministers and consuls, and those in which a State shall be party, the Supreme Court shall have original jurisdiction. In all the other cases before mentioned, the Supreme Court shall have appellate jurisdiction, both as to law and fact, with such exceptions and under such regulations as the Congress shall make."

It is beyond dispute that the case before us presents a controversy between the State of California and a corporation created under the laws of the Commonwealth of Kentucky, and, therefore, a controversy between a State and a citizen of another State. And as the judicial power of the United States extends to such a controversy, and as this court is invested with original jurisdiction "in *all* cases," to which the judicial power of the United States extends, in which a State is a party, I do not see how we can escape the obligation imposed by the Constitution, to hear this cause upon its merits, and pass such decree as will determine at least the matters in dispute between California and this Kentucky corporation.

It is said that we cannot proceed further because it appears from the evidence that a municipal corporation of California asserts, and a private corporation of the same State may have, an interest in the subject-matter of the litigation, and could not be made parties *of record* without ousting our jurisdiction. Upon that ground alone, it is held that we are without jurisdiction to pass a final decree as between the State and the defendant corporation.

I submit that the same course should be pursued in this case that was pursued in *Florida* v. *Georgia,* 17 How. 478, 491, 493. The State of Florida invoked the original jurisdiction of this court to determine a question of boundary

between it and the State of Georgia. The latter State appeared and filed its answer. The jurisdiction of this court rested upon the constitutional provisions extending the judicial power of the United States "to controversies between two or more States," and giving this court original jurisdiction in all cases in which a State is a party.

The Attorney General of the United States appeared and filed an information in which he asked leave to intervene on behalf of the government, on the ground that it was interested in the settlement of the boundary in dispute. The application to intervene was resisted by the State of Georgia upon the ground that under the Constitution this court had not and could not have jurisdiction of the cause, *except as a controversy between States of the Union*, and that the appearance of any other party would determine the jurisdiction and put the cause out of court.

The court, speaking by Chief Justice Taney, said: "The Constitution confers on this court original jurisdiction in all cases affecting ambassadors, other public ministers, and consuls, and those in which a State shall be a party. And it is settled by repeated decisions, that a question of boundary between States is within the jurisdiction thus conferred. But the Constitution prescribes no particular mode of proceeding, nor is there any act of Congress upon the subject. And at a very early period of the government a doubt arose whether the court could exercise its original jurisdiction without a previous act of Congress regulating the process and mode of proceeding. But the court, upon much consideration, held that although Congress had undoubtedly the right to prescribe the process and mode of proceeding in such cases as fully as in any other court, yet the omission to legislate on the subject could not deprive the court of the jurisdiction conferred; that it was a duty imposed upon the court, and in the absence of any legislation by Congress, the court itself was authorized to prescribe its mode and form of proceeding, *so as to accomplish the ends for which the jurisdiction was given.*"

After observing that it was the duty of the court to mould its proceedings for itself, in a manner that would best attain

the ends of justice, and enable it to exercise conveniently the power conferred — disengaging such proceedings from all unnecessary technicalities and niceties, and conducting them in the simplest form — the Chief Justice proceeded:

"It is manifest, if the facts stated in the suggestion of the Attorney General are supported by testimony, that the United States must have a deep interest in the decision of this controversy. And if this case is decided adversely to their rights, they are without remedy, and there is no form of proceeding in which they could have that decision revised in this court or anywhere else. Justice, therefore, requires that they should be heard before their rights are concluded. And if this were a suit between individuals, in a court of equity, the ordinary practice of the court would require a person standing in the present position of the United States, to be made a party, and would not proceed to a final decree until he had an opportunity of being heard.

"But it is said that they cannot, by the terms of the Constitution, be made parties in an original proceeding in this court between States; that if they could, the Attorney General has no right to make them defendants without an act of Congress to authorize it.

"We do not, however, deem it necessary to examine or decide these questions. They presuppose that we are bound to follow the English chancery practice, and that the United States must be brought in as a party on the record, in the technical sense of the word, so that a judgment for or against them may be passed by the court. But, as we have already said, the court are not bound, in a case of this kind, to follow the rules and modes of proceeding in the English chancery, but will deviate from them where the purposes of justice require it, or the ends of justice can be more conveniently attained.

"It is evident that this object can be more conveniently accomplished in the mode adopted by the Attorney General than by following the English practice in cases where the government have an interest in the issue of the suit. In a case like the one now before us, there is no necessity for a judg-

ment against the United States. For when the boundary in question shall be ascertained and determined by the judgment of the court, in the present suit, there is no possible mode by which that decision can be reviewed or reëxamined at the instance of the United States. They would therefore be as effectually concluded by the judgment as if they were parties on the record, and a judgment entered against them. The case then is this: Here is a suit between two States, in relation to the true position of the boundary line which divides them. But there are twenty-nine other States, who are also interested in the adjustment of this boundary, whose interests are represented by the United States. Justice certainly requires that they should be heard before their rights are concluded by the judgment of the court. For their interests may be different from those of either of the litigating States. And it would hardly become this tribunal, entrusted with jurisdiction where sovereignties are concerned, and with power to prescribe its own mode of proceeding, to do injustice rather than depart from English precedents. . . . And if, as has been urged in argument, the United States cannot, under the Constitution, become a party to this suit, in the legal sense of that term, and the English mode of proceeding in analogous cases is, therefore, impracticable, it furnishes a conclusive argument for the mode proposed, for otherwise there must be a failure of justice."

The mode adopted in *Florida* v. *Georgia* was to allow the United States to file its proofs without becoming a party in the technical sense of the term, but without right to interfere in the pleading or evidence or admissions of the States, or of either of them; the Attorney General of the United States to be heard in argument, and the court, in deciding upon the true boundary line, to take into consideration all the evidence offered by the United States and by the States.

Now, that is, substantially, the course pursued at the outset in this case. The city of Oakland, by leave of the court, has presented its proofs. It has been allowed to file briefs and such documents and maps as would illustrate its alleged title. It has participated in the taking of all the evidence in the

cause. The case has been fully heard upon its merits, as they involve the rights of California, the Southern Pacific Company, and the city of Oakland. All of those parties earnestly desire this court to proceed, as between them, to a final decree on the merits. If any other party is interested in the issues, we can hold the cause until that party, if it so wishes, can make proof of such interest and its nature, just as the city of Oakland has done.

As this court, having original jurisdiction of controversies between two or more States, would not refuse to determine the controversy between Florida and Georgia because other parties had an interest in the subject-matter of that controversy, and could not, as was claimed, be admitted as parties of record without defeating its jurisdiction, ought we to dismiss a suit between a State and a corporation or citizen of another State because other parties interested in the result of that suit cannot be admitted as parties of record, but may be admitted to occupy such position with reference to the case as will enable the court to attain the ends of justice as between all who assert any interest in the result of the litigation? The suggestion that the Oakland Water Front Company has such an interest as entitles it to be heard comes from the court, not from that company or from any of the parties before us. If it be deemed proper to give that company an opportunity to assert its claims, we could, as just suggested, direct notice to be given to it of the pendency of this litigation, so that it could, if so advised, appear in the same way in which the city of Oakland has been allowed to appear.

I have thus far considered the question upon the assumption that a decree as between California and the Southern Pacific Company might legally affect the claims of others who are not formal parties to the suit. The court does not say, in words, that such a decree could be pleaded in bar in any subsequent suit, or would affect in law the rights of the city of Oakland or the Water Front Company. And I take it that the court does not mean to be understood as attaching any such effect to a decree simply between the parties to the present bill. Now, if a decree between the parties to the bill

will not, in law, bar any claim of parties who are not admitted to be heard, in some form, it is difficult to understand why the court should not recognize its constitutional obligation to determine this controversy between a State and a corporation of another State. It is none the less a controversy between a State and a citizen of another State, because others, not parties of record, may have an interest in its determination. Let us suppose a decree was passed, only as between California and the Kentucky corporation, dismissing the suit for want of equity. That decree would be conclusive as between the State and that corporation. But it would not have any effect, as a bar, in a subsequent litigation, respecting the same or some of the same matters between the Southern Pacific Company and the city of Oakland, or between the Southern Pacific Company and the Water Front Company, or between the State and one or both of the corporations not parties of record. Undoubtedly any decree rendered by this court would be cited by the successful party, when involved in litigation with other parties, as evidence as to what the law is. But it would not be obligatory upon any court in other suits, between different parties. A suit upon coupons of bonds issued by a municipal corporation might be so framed as to involve the validity of the bonds themselves — a question in which every holder of such bonds would, in a sense, be interested. But a judgment in such a suit that the bonds were void for the want of power to issue them, while conclusive as between the parties to that suit, would not conclude the holders of bonds who were not before the court in some effective form. A suit to foreclose a second mortgage upon the property of a corporation might result in a decree declaring that the *corporation* was without power to give any mortgage whatever upon its property. But that decree would not conclude the parties interested in a first mortgage who were not in court, nor represented by the trustee named in the mortgage under which they claimed. So a decree as between California and the Southern Pacific Company would not conclude outside persons neither admitted as parties, nor permitted to appear and be heard in respect of their rights. In this view, this

court can decline to determine finally the rights of any except those who are parties of record, and as the controversy between those parties is one between a State and a corporation and a citizen of another State, it is one within our original jurisdiction.

It seems to me that according to both the letter and spirit of the Constitution this court cannot refuse to exercise its original jurisdiction over a controversy between a State and a citizen of another State, because a citizen of the plaintiff State has or may assert some interest in the subject-matter of that controversy; and that in such a case it is our duty either to permit the latter citizen to be heard without becoming a party of record if thereby our jurisdiction would be defeated, or proceed to a decree between the original parties to the controversy, leaving unaffected, in law, the rights of others.

Our constitutional duty is to determine the "case" in which the State is a party, taking care to give all who are interested in its determination a reasonable opportunity to produce evidence and to be heard in support of their rights. In this way only can we give full effect to the Constitution, and at the same time attain the ends of justice, unembarrassed by mere forms. We should not impose undue restrictions upon the right of the States to invoke our original jurisdiction. Jurisdiction to determine *all* cases to which the judicial power of the United States extends, in which a State is a party, gives authority to decide every controversy that arises in such cases, the determination of which is either necessary or proper in order to dispose of the case in which it arises.

If this be not a sound interpretation of the Constitution, the result will be that this court will not, in any case, exercise its original jurisdiction over a case "between two or more States," if it appears that individual citizens have an interest in its determination. A controversy capable of judicial solution may arise between two States, and it may be important to the peace of those States, indeed, of the whole country, that it should be determined by this court. But, under the interpretation of the Constitution adopted in this case, our

jurisdiction cannot be invoked in any mode for its final settlement if it appears in evidence that some individual or corporation is interested in that settlement. Still more, although this court is given original jurisdiction of a case between one of the States of the Union and a foreign State, it will not exercise it even in such a case if individual parties are interested in the controversy.

As the presence in a case arising under the Constitution, or the laws, or the treaties of the United States, of a question or controversy depending upon general principles of law, will not oust the jurisdiction of the courts as conferred by the Constitution, *Osborn* v. *Bank of the United States*, 9 Wheat. 738, so the presence, in a case brought by a State against a citizen of another State, of a question or controversy in which others, besides the parties of record, are interested, ought not to oust the jurisdiction of the court to determine the controversy between the original parties; especially where the decree between the parties of record will not, in law, conclude, or is so framed that it will not conclude, the rights of others who were not, in some form, before the court.

Under the ruling now made, how is the State of California to obtain a judicial determination of the controversy between it and this foreign corporation? It is said that a suit may be brought in one of its own courts against all persons asserting an interest in the property rights here in question. The effectiveness of such a suit would depend upon the ability of the State to bring the Kentucky corporation into court, so that it would be bound by the final decree. It may be that that corporation does business in California under the condition, among others, that it will have an agent there upon whom process can be served. But surely the duty of this court, under the Constitution, to exercise its original jurisdiction in respect to a controversy between a State and a corporation of another State cannot depend upon the question whether the plaintiff State can compel that corporation to answer in its own courts. Suppose the defendant is an individual citizen of another State who cannot be served with process in the State desiring to bring suit against him. In

such a case, the State must, under the principles now announced, be without a remedy for the protection of its rights, or it will be driven to sue its adversary in the courts of his own State, whose decision will be final, unless the controversy happens to involve some question of a Federal nature; and even then this court could only decide the Federal question presented, and must accept the decree of the state court as conclusive upon all other questions. The State could not sue in any Circuit Court of the United States, for that court has no jurisdiction under the acts of Congress of a suit brought by a State against a citizen of another State, unless perhaps such suit be one arising under the Constitution or laws or treaties of the United States. The framers of the Constitution did not intend to subject a State, under any circumstances, to the indignity of being compelled to submit its controversies with citizens of other States to the courts of such other States. They opened the doors of this court to every State having a cause of action against a citizen of another State. In my judgment, we have no right to refuse a hearing to a State having such a cause of action, because of the circumstance that one or more of its people assert an interest in the subject-matter of its controversy with the defendant citizen of another State.

For these reasons, I am constrained to dissent from the opinion and judgment of the court.

Mr. Justice Brewer authorizes me to say that he concurs in this opinion.